534 So.2d 386 (1988)
Anthony BERTOLOTTI, Appellant,
v.
STATE of Florida, Appellee.
No. 71432.
Supreme Court of Florida.
April 7, 1988.
Rehearing Denied December 28, 1988.
Larry Helm Spalding, Capital Collateral Representative, Mark Evan Olive, Chief Asst. CCR, and Nicholas Trenticosta, Staff Atty., Office of the Capital Collateral Representative, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., and Margene A. Roper and Sean Daly, Asst. Attys. Gen., Daytona Beach, for appellee.
PER CURIAM.
Anthony Bertolotti, a prisoner under sentence of death and execution warrant, appeals the trial court's denial of his Florida Rule of Criminal Procedure 3.850 motion for postconviction relief, which was filed by the Capital Collateral Representative. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm the order denying relief.
Bertolotti's conviction of first-degree murder and sentence of death were affirmed by this Court in Bertolotti v. State, 476 So.2d 130 (Fla. 1985). The pertinent facts surrounding the murder as set forth in that opinion are as follows:
Bertolotti was arrested for and charged with first-degree murder in the death of Carol Miller Ward. The victim's body was discovered in her home by her husband when he returned from work. She had been repeatedly stabbed with two knives; she was naked from the waist down and medical tests showed intercourse had taken place, though there was no evidence of physical trauma to the vaginal area; she had been strangled and beaten.
Id. at 131. This Court recently denied his petition for a writ of habeas corpus, based on claims of ineffective assistance of appellate counsel. Bertolotti v. Dugger, 514 So.2d 1095 (Fla. 1987).
In his rule 3.850 motion to the trial court Bertolotti raised five claims: (1) trial counsel provided ineffective assistance by offering no defense to first-degree felony murder; (2) trial counsel were ineffective for *387 failing to provide competent mental health assistance for the defendant when the only defense offered at trial was mental health based; (3) Bertolotti was denied a meaningful and individualized capital sentencing determination due to his lawyers' unreasonable failure to conduct a thorough, independent investigation and failure to present compelling statutory and nonstatutory mitigation factors;[1] (4) the prosecutor and trial judge misinformed and thus impermissibly diminished the jurors' understanding of the importance of their role and responsibility in the sentencing pursuant to Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985);[2] and (5) because of the overlap of statutory aggravating circumstances with the elements of the offense, his death sentence violates the eighth and fourteenth amendments of the United States Constitution.[3]
After a four-day hearing, the trial judge found that in connection with the ineffective assistance of trial counsel claims (1) Bertolotti had failed to show that his lawyers' performance was unreasonable or (2) that there was a reasonable probability that the results of either the guilt or penalty phase proceedings would have been different but for the alleged substandard performance as required under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The court correctly noted that in evaluating whether a lawyer's performance falls outside the wide range of professionally competent assistance "courts are required to (a) make every effort to eliminate the distorting effects of hindsight by evaluating the performance from counsel's perspective at the time, and (b) indulge a strong presumption that counsel has rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment with the burden on claimant to show otherwise." Quoting Blanco v. Wainwright, 507 So.2d 1377, 1381 (Fla. 1987).
First, we address Bertolotti's claim that his lawyers were ineffective for failing (1) to raise the defense of voluntary intoxication to the specific-intent crimes of premeditated murder, robbery and burglary and (2) to request a jury instruction on intoxication during the guilt phase of the trial. At trial the only evidence of intoxication was a statement made by Bertolotti in his first confession to police that at the time of the murder he was "high" on a Quaalude he bought from a friend. The trial court correctly determined that such a "self-serving declaration" made during a confession, which was unsupported by independent testimony or evidence and was specifically contradicted at trial, was insufficient to warrant the giving of an intoxication instruction. See Cirack v. State, 201 So.2d 706 (Fla. 1967) (self-serving statements of intoxication alone provide no basis for expert testimony as to whether a defendant was able to distinguish right and wrong at the time of the murder). An instruction on intoxication is only warranted when there is sufficient evidence of intoxication. Gardner v. State, 480 So.2d 91 (Fla. 1985). The record also supports the trial court's conclusion that "on the facts of this case there simply was no reasonable defense of intoxication." Trial counsel were not deficient for failing to raise a defense which was unreasonable under the circumstances or for failing to request an instruction which was not warranted by the evidence. His lawyers' decision to present a "reasonable doubt" defense to the underlying felonies of robbery, sexual battery and burglary was reasonable under the circumstances.
*388 We next address Bertolotti's claim that his lawyers were ineffective for failing to have him evaluated by a mental health expert. In connection with this claim Bertolotti contends that such an evaluation would have revealed insanity at the time of the murder and confession as well as provided mitigating evidence to be used during the penalty phase.
Although six months prior to trial a motion for psychiatric examination was granted and Dr. Pollack was appointed to examine Bertolotti, arrangements were never made to have him examined until the morning of the sentencing hearing, at which time Bertolotti refused to see Dr. Pollack. At the rule 3.850 motion hearing, Bertolotti's lawyers at trial, Peter Kenny and Clyde Wolfe, testified that in hindsight they probably should have had him evaluated by Dr. Pollack prior to trial and certainly would do so if they were currently handling his defense. Chan Muller, a legal expert for the defense, testified that under the circumstances Bertolotti's lawyers were deficient for failing to have Bertolotti evaluated. The trial court gave little weight to Mr. Muller's testimony, "as he had not read the trial transcript; did not talk to the defendant; ... did not talk to defense counsel as to strategy ... [and] seems to feel the intervention of mental health experts is always required whether it is merited by the facts of the case or not." The trial judge also noted that in critiquing their own performance, defense counsel allowed the "distorting effects of hindsight" to play a part in their self evaluation, by measuring their performance "to a large extent, not from their perspective at the time or reasonable practices at the time, but from their present perspective of reasonable assistance imparted to them largely from the allegations of the 3.850 motion itself and sophisticated seminar strategies which they now glean as mandatory practice." The trial court concluded that since defense counsel had no reason to doubt Bertolotti's sanity, they were not deficient for failing to follow through with an evaluation which was requested "on the advice of a public defender who routinely filed them with the intent that if it became apparent that it was needed, they would not have to ask for it later."
While mental condition is not necessarily an issue in every criminal proceeding, Blanco v. Wainwright, 507 So.2d at 1383, where there is evidence calling into question a defendant's sanity, defense counsel is bound to seek the assistance of a mental health expert. See Bush v. Wainwright, 505 So.2d 409 (Fla.), cert. denied, ___ U.S. ___, 108 S.Ct. 209, 98 L.Ed.2d 160 (1987); see also Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). As recognized by the United States Supreme Court, where a defendant's mental condition is in question, "without the assistance of a mental health expert ... the risk of an inaccurate resolution of sanity issues is extremely high." 105 S.Ct. at 1096. The trial court's conclusion that defense counsel "had no reason to doubt Bertolotti's sanity in any respect" is not supported by the testimony and other evidence adduced at the 3.850 hearing. Considering only those factors which the public defender's office was aware of prior to trial, it is apparent that defense counsel had reason to question Bertolotti's sanity at the time of the offense.
Mr. DuRocher, the elected Public Defender of the Ninth Judicial Circuit who assigned the case to assistant public defenders Mr. Wolfe and Mr. Kenny, testified that he first met with and interviewed Bertolotti after Bertolotti's arrest in October 1983. When asked whether as a result of this interview he had formed an opinion with regard to whether a mental evaluation of Bertolotti should be conducted, Mr. DuRocher responded that "I certainly had signals about issues of competence and sanity... . [Y]es, all the signals were there. You had to  he should have been evaluated." According to his testimony, a number of factors led Mr. DuRocher to question Bertolotti's mental condition. First, during the interview Bertolotti, who had already given a statement to the police, was in a highly "emotional state," breaking down and "weeping and sobbing" as he recited the facts of the murder. The "bizarre, inherently unbelievable" story Bertolotti *389 told Mr. DuRocher also served as a "signal." Another strong indicator that mental state at the time of the crime should have been evaluated was a statement by Bertolotti that he had told the police that "he had been out of himself [during the murder] and then came back to himself." Next to this entry in his notes concerning the interview Mr. DuRocher wrote in parentheses "state of mind." Mr. DuRocher testified that although his questions concerning mental state appeared in his notes, which were the first entry in Bertolotti's file, he did not recall specifically informing either Mr. Wolfe or Mr. Kenny of his concerns, as he "trusted they would have seen the same, the same or very similar signals" as he had.
Other evidence which indicated that Bertolotti should have been evaluated was the first tape recorded confession to the police in which Bertolotti was extremely emotional, crying, moaning and wailing throughout the statement. Bertolotti also stated during this confession that "I just, I don't know what was happening to me." Mr. Kenny, who was in charge of presenting Bertolotti's case during the sentencing phase, acknowledged that he had not listened to the taped confessions and had not been aware of Bertolotti's emotional state during them until the tapes were played to the jury during the guilt phase of the trial. Mr. Kenny also testified that prior to trial he felt Bertolotti should have been examined and that he repeatedly asked Mr. Wolfe, who was in charge of the investigation, to schedule the evaluation. Mr. Kenny testified that "it certainly seemed to me that, given the facts of the case and what little I knew of Bertolotti's background, that there certainly would be a possibility that there [would] be something shown [by a mental evaluation], if not necessarily insanity, at least in terms of mitigation."
Notes taken by Mr. Wolfe reflect that Sharon Griest, Bertolotti's girlfriend at the time of the murder, told him that she "believes" that Bertolotti "needs psychiatric help," that "he did not know what he was doing at the time of the offense" and that he might have a "split personality." Griest also told Mr. Wolfe that Bertolotti was discussing "suicide a great deal." Even Mr. Wolfe acknowledged that these statements in conjunction with other factors should have caused him to question Bertolotti's mental condition.
In light of the above factors, all of which Mr. Wolfe and Mr. Kenny were either aware of or should have been aware of, it is apparent that both attorneys had reason to question their client's sanity. Although it may not be necessary to have every defendant who is charged with a capital offense evaluated by a mental health expert, where there is sufficient evidence to bring a defendant's sanity into question, defense counsel is deficient in his performance if he fails to seek and follow through with a mental evaluation of his client.
We next turn to the second prong of the Strickland test. In passing on whether there is a reasonable probability that the outcome would have been different if a mental evaluation had been performed and expert testimony presented, we shall consider separately the guilt and penalty phases of the trial. Although it is true that the jury might have relied on testimony concerning Bertolotti's mental condition to find that Bertolotti was either temporarily insane during the actual murder or, as argued by defense counsel, that he was guilty of second-degree murder because he did not premeditate, there was overwhelming evidence to support a conviction of felony murder. The jury in this case was instructed on premeditated murder and felony murder based on robbery, sexual battery, and burglary. A general verdict was received. During the 3.850 hearing, the trial judge inquired of Dr. Merikangas, the defense psychiatrist, concerning the exact point in time when Bertolotti became legally insane:
Court: His desire to stab [the victim] or his desire to rob [her] during the course of the incident is inconsistent, in your opinion, on these facts?
Dr. Merikangas: Those are two questions. His desire to rob  I have no question that he had the desire to rob [the victim].

*390 Court: And at that time [Bertolotti] was able to form an intent again.
Dr. Merikangas: Well, as I said, I don't know when he robbed her. At that time I believe that he formed the intent to rob her.
Thus, testimony such as this would not have been a defense to felony murder, and its absence would not have resulted in a conviction of less than first-degree murder.
In considering the ineffectiveness of counsel as it relates to an attack on a death sentence, the United States Supreme Court in Strickland v. Washington said:
When a defendant challenges a death sentence ... the question is whether there is a reasonable probability that, absent the errors, the sentencer  including an appellate court, to the extent it independently reweighs the evidence  would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been ... affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.
466 U.S. at 695-96, 104 S.Ct. at 2069.
Before undertaking this analysis, we note that Bertolotti's' counsel finally did arrange for him to be examined by a psychiatrist shortly before the sentencing hearing. Bertolotti declined to talk to the psychiatrist. Despite the argument that had there been more time Bertolotti might have been talked into submitting to an examination, the trial judge ruled that: "By refusing to be examined by Dr. Pollock, Bertolotti could not only effectively waive the defense of insanity but forego presentation of mitigating evidence at sentencing."
The evidence at the 3.850 hearing concerning Bertolotti's sanity was conflicting. Dr. Merikangas testified that he had recently examined Bertolotti and found him to be a "schizophrenic who had a catastrophic reaction to stress" which was apparently triggered by the victim's screams. Other doctors disagreed.
Dr. Kirkland, also a psychiatrist, testified that he found Bertolotti to be intelligent, with no evidence of organic brain disorder or major psychotic mental disorder. He characterized as "hogwash" Dr. Merikangas's theory that the victim's screams caused Bertolotti to become insane and kill her. Dr. Kirkland pointed out that Bertolotti told him that he killed the victim to keep her quiet because her screams would attract attention.
John Cassidy, a clinical psychologist, was the only expert to testify who had actually examined Bertolotti before the trial. Cassidy said he had been called to see Bertolotti in the Orange County jail because Bertolotti had related to a nurse that on a previous occasion he had talked of suicide. Cassidy testified that Bertolotti exhibited no unusual or bizarre behavior during the examination or in the course of a subsequent screening by a nurse. Cassidy again examined Bertolotti before the postconviction hearing and testified that he saw no indication of schizophrenia.
Dr. Upson, another expert in clinical psychology, concluded as a result of examining the records of his psychological history that Bertolotti was not delusionally schizophrenic but only exhibited the characteristics of antisocial behavior and depression.
Sergeant Scoggins testified as a nonexpert witness who had observed Bertolotti's manner, speech and conduct at the time of his confessions shortly after commission *391 of the murder. Scoggins said that Bertolotti was remorseful and lucid, was able to recall detailed events of the crime and behaved in a normal manner. The foregoing evidence provided the trial judge with a strong factual basis to conclude that counsel's omissions made no difference.
In order to provide Bertolotti with relief, we would not only have to reject the trial judge's findings but we would also have to speculate that had defense counsel caused Bertolotti to be examined earlier in the proceedings he would have been persuaded to agree to be examined, that the examiner would have then presented evidence of Bertolotti's mental incapacity which would have convinced the jury to recommend against the death penalty and that the trial judge would then have sentenced him to life imprisonment. Considering the nature of this offense and the fact that Bertolotti had previously been convicted of three violent felonies, we cannot say as a matter of law that Bertolotti met the burden of proving that it was reasonably likely that absent counsel's errors he would have received only a life sentence.
We affirm the denial of Bertolotti's motion for postconviction relief.
It is so ordered.
McDONALD, C.J., and OVERTON, GRIMES and KOGAN, JJ., concur.
EHRLICH, J., concurs in part and dissents in part with an opinion, in which SHAW and BARKETT, JJ., concur.
EHRLICH, Justice, concurring in part and dissenting in part.
I concur in all aspects of the majority's opinion with the exception of that portion which denies relief in connection with the sentencing phase of the trial. I believe that Bertolotti has met his burden of showing that there is a reasonable probability that absent counsel's failure to seek a psychological evaluation and to present psychological testimony in mitigation he would have ultimately received a life sentence.[1]
At the hearing on Bertolotti's 3.850 motion, Dr. Merikangas testified that in his opinion Bertolotti suffers from chronic undifferentiated schizophrenia and that at the time of the murder, Bertolotti "did not know what he was doing and did not know that it was wrong." In Dr. Merikangas' opinion Bertolotti "is a schizophrenic who had a catastrophic reaction to stress" which was apparently triggered by the victim's screams. Dr. Merikangas further testified that his evaluation would have been relevant to at least three statutory mitigating factors. In Dr. Merikangas' opinion, the diagnosis that Bertolotti was a schizophrenic who was having a catastrophic reaction to stress at the time of the murder would support a finding that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance and a finding that Bertolotti's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. He further testified that the fact that Bertolotti "felt trapped with no exit" in conjunction with Bertolotti's second confession that he was "put up" to murdering the victim by his girlfriend would evidence that Bertolotti acted under extreme duress.
Although, as noted by the majority, the state offered expert testimony to refute Dr. Merikangas' testimony, I believe there *392 is a reasonable probability that a jury would have found this mitigating testimony credible and sufficient to overcome the aggravating factors[2] proven in this case and would have returned a life recommendation. Because reasonable people considering the aggravating factors present in light of the mitigating factors evidenced by Dr. Merikangas' testimony could differ as to whether death was appropriate in this case, see Tedder v. State, 322 So.2d 908 (Fla. 1975), I believe that confidence in the correctness of Bertolotti's sentence has been undermined, entitling him to a new sentencing proceeding before a jury.
Based on my conclusion that Bertolotti has adequately demonstrated prejudice in connection with the sentencing phase, I would reverse the denial of relief in connection with the sentence, vacate the death sentence and remand the cause to the trial court for a new sentencing proceeding before a jury.
SHAW and BARKETT, JJ., concur.
NOTES
[1] Claim 3 is subsumed within claim 2 and need not be independently discussed.
[2] Claim 4 is procedurally barred because it was not raised on direct appeal. See Demps v. State, 515 So.2d 196 (Fla. 1987). In any event, the rationale of Caldwell v. Mississippi is inapplicable to the Florida procedure in which the judge rather than the jury renders the sentence. Grossman v. State, 525 So.2d 833 (Fla. 1988).
[3] Claim 5 is procedurally barred because it was not raised on direct appeal. Ritter v. Thigpen, 828 F.2d 662 (11th Cir.1987). Moreover, this argument has now been rejected by the United States Supreme Court. Lowenfield v. Phelps, ___ U.S. ___, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).
[1] I cannot agree with the trial court's conclusion that by refusing to be examined by Dr. Pollack, Bertolotti "effectively waived the presentation of mitigating evidence [of mental condition] at the penalty phase." Mr. Kenny acknowledged that generally when a client refuses to speak to a mental health expert, "you talk to the client, find out what his problem [is] why he [doesn't] want to talk to the mental health expert and generally you can find the reason and overcome that and have a mental health expert talk to him." Mr. Kenny concedes that because the interview with Dr. Pollack was scheduled for the very morning of sentencing, he did not have time to speak to Bertolotti concerning his refusal to see Dr. Pollack. Even if I were to accept the general proposition that a defendant may waive the presentation of mitigating evidence by refusing to be examined by a mental health expert, I would decline to recognize such a waiver where, as here, a defendant's refusal to undergo a mental examination is so closely linked to counsels' unreasonable failure to timely seek and schedule such examination.
[2] The trial court found in aggravation that Bertolotti had been previously convicted of three violent felonies, that the murder occurred during commission of a robbery, and that the murder was especially heinous, atrocious, and cruel. 476 So.2d at 132.