588 So.2d 975 (1991)
James Hudson SAVAGE, Appellant,
v.
STATE of Florida, Appellee.
No. 75494.
Supreme Court of Florida.
October 3, 1991.
Rehearing Denied December 6, 1991.
*976 James B. Gibson, Public Defender and Christopher S. Quarles, Assistant Public Defender, Chief, Capital Appeals, Seventh Judicial Circuit, Daytona Beach, and Clive A. Stafford Smith, Atlanta, Ga., for appellant.
Robert A. Butterworth, Atty. Gen. and Kellie A. Nielan, Asst. Atty. Gen., Daytona Beach, for appellee.
Steven Goldstein, Tallahassee, and Terence James Malone of Barrister & Sol. of the Supreme Court of Western Australia, Geraldton, West Australia, amicus curiae for The Nat. Aboriginal and Islander Legal Services Secretariat, Inc.
PER CURIAM.
James Savage appeals his conviction of first-degree murder and sentence of death. We have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution. Although we affirm Savage's conviction, we vacate his death sentence and remand for imposition of a sentence of life imprisonment with no possibility of parole for twenty-five years.
*977 The day after Thanksgiving in 1988 a friend found the victim's body in an alley behind the victim's interior design shop. An autopsy showed that she had been beaten and strangled. A police officer had seen Savage near the victim's shop two nights previously, the approximate time of the murder.
While canvassing the area looking for anyone who might know something about the crime, two police officers found Savage and two other men sitting on benches outside a motel. After asking for identification, the officers radioed in a check for warrants and received word that a detective wanted to talk with Savage. Two detectives arrived shortly afterwards and asked Savage if he would accompany them to the station, which he agreed to do.
They arrived at the station between 6:15 and 6:30 p.m. The detectives noticed what they thought might be spots of blood on Savage's shirt and shoes and scratches on his face and hands and asked him what had happened. Savage told them that he had been in a fight and that he injured his hand hitting a television set in his room. He also told the officers that he was in violation of probation because he had never reported to a probation officer after his recent release from prison. A detective asked if he could have Savage's shirt, which Savage gave to him along with his shoes. The detectives took these items to the laboratory for a presumptive-blood test and tried to verify Savage's story about the blood and scratches.
Unable to verify Savage's story, the detectives came back to him around 8:00 p.m. and asked if he would consent to a one-on-one confrontation with a person who had seen two men near the victim's shop the evening of the murder. They read Savage the Miranda[1] rights, and he verbally agreed to the confrontation. After that, however, he refused to sign a confrontation waiver and stated that he had been around when people had been killed before and he had not been arrested. None of the officers had mentioned a murder up to that point.
The detectives again left Savage alone until a Department of Corrections employee arrived around 10:00 p.m. and advised Savage that he was in violation of probation. The police then arrested Savage for that offense. They advised Savage of his Miranda rights again, and Savage made a statement implicating himself in the victim's robbery but claiming that a companion assaulted and killed her. In an attempt to identify that companion the detectives went to Savage's jail cell the following day with photographs of several individuals. That afternoon Savage confessed that he alone robbed and killed the victim. The detectives charged him with murder and arrested him.
The state indicted Savage for first-degree murder, robbery with a deadly weapon, and sexual battery. The jury convicted him as charged and in the penalty phase recommended that he be sentenced to life imprisonment. The trial court, however, sentenced him to death, prompting this appeal.
Prior to trial, Savage moved to suppress all of his statements as having been "illegally obtained through the use of coercion, duress, and inducements." At the suppression hearing one of the officers who first encountered Savage testified that upon finding Savage he did not suspect him of having done anything. A detective who took Savage to the station testified that Savage went voluntarily and was under no restraint, that Savage was left alone and unguarded at the station, that Savage fell asleep while at the station and did not appear to be nervous or under the influence of drugs or alcohol, and that Savage could have left at any time before his arrest for violation of probation because until then the police did not have probable cause to hold him. Two other detectives testified similarly. Savage testified that he did not think he could refuse to accompany the detectives to the station, that he told them he had been drinking and smoking crack, that this was the first time he had ever been taken to a police station without handcuffs *978 and riding in the front seat of the car, and that once at the station he did not think he could leave. The court denied the motion to suppress, finding that all of Savage's statements had been made freely and voluntarily, that the seizure of Savage's clothes and shoes had been proper, and that Miranda warnings had been given in a timely manner.
Now, Savage claims that he was not in violation of probation, that his arrest for that offense was illegal, and that any information or evidence resulting from that arrest should have been inadmissible under Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We disagree with Savage's argument for several reasons.
Savage alleges that after his trial the victim's family sued the Florida Department of Corrections for releasing him too soon and that the department defended by arguing that he had served his sentence and was not on probation. At oral argument, however, the state told this Court that the case is on appeal and that the department now says Savage was on probation at the time of this crime. If Savage were on probation at that time, his arrest for violation of probation would have been lawful. The state's statutes provide for lawful warrantless arrests and for the arrest of persons who have violated probation. §§ 901.15, 948.06, Fla. Stat. (1989).
Even if Savage were not in violation of probation, we hold that, on the facts of this case, the court did not err in refusing to suppress his statements. The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). "Whether the exclusionary sanction is appropriately imposed in a particular case ... is `an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" United States v. Leon, 468 U.S. 897, 906, 104 S.Ct. 3405, 3412, 82 L.Ed.2d 677 (1984) (quoting Illinois v. Gates, 462 U.S. 213, 223, 103 S.Ct. 2317, 2324, 76 L.Ed.2d 527 (1983)). The prime purpose of the exclusionary rule is to deter the police from engaging in "willful, or at the very least negligent, conduct which has deprived the defendant of some right... . Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." Michigan v. Tucker, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974); accord Leon; United States v. Peltier, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975).
In the instant case no reason exists to apply the exclusionary rule.[2] Savage, himself, thought he was in violation of probation and was the first person to raise the subject. The police acted in good faith on the information given by Savage, with an objectively reasonable belief that arresting Savage for violation of probation would be proper. It cannot be said that the police engaged in bad acts, or negligently deprived Savage of any constitutional rights. Therefore, we hold that, even if Savage were illegally arrested for violation of probation, the trial court did not err in refusing to suppress the statements made after that arrest.
Savage also argues that he was in custody when taken to the police station and that, therefore, the Miranda warnings given two hours later were untimely and he did not freely and voluntarily tell his initial story or give his shoes and shirt to the detectives. The trial court considered this issue in ruling on the motion to suppress, however, and determined that the initial Miranda warning had been timely. A trial court's ruling on a motion to suppress is presumptively correct. Henry v. State, 586 So.2d 1033 (Fla. 1991); Owen v. State, 560 So.2d 207 (Fla.), cert. denied, ___ U.S. ___, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990). Savage has shown no error in the trial *979 court's ruling, and we find no merit to this issue.
The state presented a tape recording of Savage's first statement in which Savage said: "We were smoking rocks [of crack cocaine] and then we ran out and just looked for something to steal so we could sell it and get some more." During cross-examination of the detective who played that tape recording for the jury, the following exchange occurred:
Q. [by Turner, defense counsel]. Officer, you have several years on a police department, Melbourne PD?
A. [by Detective Fernez]. That's correct, sir.
* * * * * *
Q. Thirteen years, and you're experienced to an extent of drugs, correct?
A. Yes, sir.
Q. You heard that initial or the initial part of the confession on the tape where he said smoking of rock?
A. That's correct.
Q. Isn't that street lingo to smoking rock cocaine?
A. That's correct, sir.
Q. In your training, isn't rock cocaine extremely addicting?
A. That's correct, sir.
Q. It gives you an intense high initially?
A. That's correct.
Q. Gives you immense craving for more rock cocaine?
A. That's correct, sir.
On redirect examination the assistant state attorney asked the following questions and the detective gave the following answers:
Q. And did he ever tell you that the reason this crime took place was because he was high on crack cocaine?
A. No, sir, he did not.
Q. Or that he was high on marijuana?
A. No, sir, he did not.
Q. Or that he was high on alcohol?
A. No, sir, he did not.
Defense counsel and the detective then engaged in the following exchange on recross:
Q. Did he tell you that prior to the crime, he and others had smoked rock cocaine, isn't that correct?
A. As you heard on tape, yes, sir.
Q. And he had told you later on, at least later you found out that he immediately after the death, he went and purchased  and got drunk and used rock cocaine?
A. That's correct, sir.
The defense requested an instruction on voluntary intoxication. The court heard the parties several times regarding the intoxication instruction, but eventually refused to give it. During deliberations, the jury asked that Savage's confessions be replayed and that several sections of testimony, including the portions quoted above, be reread. Following that, the foreman asked if there was "any concrete evidence to support that Mr. Savage actually used cocaine?" The court then told the jurors they would have to rely on the evidence they had heard. Now, Savage claims that the trial court erred in refusing to give the intoxication instruction.
Voluntary intoxication has been recognized as a defense in this state for the last century. Linehan v. State, 476 So.2d 1262 (Fla. 1985). A defendant is entitled to an instruction on the theory of the defense if the evidence supports giving such an instruction. Robinson v. State, 574 So.2d 108 (Fla. 1991). However, "where the evidence shows the use of intoxicants but does not show intoxication, the [voluntary intoxication] instruction is not required." Linehan, 476 So.2d at 1264. This Court has also stated: "It is not error to refuse such an instruction when there is no evidence of the amount of alcohol consumed during the hours preceding the crime and no evidence that the defendant was intoxicated." Gardner v. State, 480 So.2d 91, 93 (Fla. 1985).
Contrary to Savage's argument, there is insufficient evidence of intoxication in this case. Savage's self-serving statement to the detective that he had been drinking and smoking crack is unsupported by any evidence of the quantity of intoxicants that he consumed or for how long he *980 had been consuming them. Therefore, we hold that the court did not err in refusing to give the instruction on voluntary intoxication. Cf. Bertolotti v. State, 534 So.2d 386 (Fla. 1988); Robinson v. State, 520 So.2d 1 (Fla. 1988).
Our review of this record discloses competent, substantial evidence to support Savage's conviction of first-degree murder, and we affirm that conviction.[3]
Turning to the sentence, however, we hold that the trial court should not have overridden the jury's recommendation of life imprisonment. Savage is the illegitimate son of Australian aborigines. Pursuant to then-existent Australian policy, he was taken away from his mother shortly after birth and, when four days old, placed with the Savages, a white Australian couple, who subsequently adopted him. Savage's adoptive father is a minister, and the family moved to California when Savage was six and then to Florida several years later. When Savage was seventeen, his adoptive family returned to Australia, leaving him in Florida. Savage has a considerable adult and juvenile record dating back to his early teens.
Savage's natural mother testified on his behalf at sentencing. Members of his adoptive father's churches who knew Savage as a child in Australia and in Florida testified that Savage was disciplined more than his adopted brother and sister, that he seemed afraid of his adoptive father, and that he seemed out of place as a black person among whites. A psychiatrist concluded, based on what Savage had told him and on his own examination of Savage, that drug and alcohol abuse combined with an organic brain syndrome produced a personality disorder that substantially impaired Savage's capacity to appreciate the criminality of his acts. This expert was adamant in his opinion that Savage was substantially impaired emotionally. A pharmacologist who examined Savage concurred with the psychiatrist's assessment.
"In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So.2d 908, 910 (Fla. 1975). Here, however, reasonable people could differ as to the propriety of the death sentence. The testimony outlined above reasonably could have persuaded the jury to recommend life imprisonment. We disagree with the trial court that the facts requiring the death sentence are sufficiently clear and convincing in this case. Cf. Pentecost v. State, 545 So.2d 861 (Fla. 1989); Hansbrough v. State, 509 So.2d 1081 (Fla. 1987); Ferry v. State, 507 So.2d 1373 (Fla. 1987). Therefore, we vacate Savage's death sentence and direct the trial court to resentence him to life imprisonment with no possibility of parole for twenty-five years.[4]
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, BARKETT, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Cases applying the "collective knowledge" rule, such as Albo v. State, 477 So.2d 1071 (Fla. 3d DCA 1985), are factually distinguishable and, thus, inapposite to the instant case.
[3] Savage raises several other issues regarding the guilt phase of his trial, but our review of the record shows them to have no merit.
[4] Due to this holding, we do not address the other sentencing issues.