789 So.2d 297 (2001)
STATE of Florida, Petitioner,
v.
Brian L. GLATZMAYER, Respondent.
No. SC00-602.
Supreme Court of Florida.
May 3, 2001.
Rehearing Denied June 29, 2001.
*299 Robert A. Butterworth, Attorney General, and Celia A. Terenzio, Assistant Attorney General, West Palm Beach, FL, for Petitioner.
Michael Salnick, West Palm Beach, Florida; and Ian J. Goldstein, West Palm Beach, FL, for Respondent.
SHAW, J.
We have for review Glatzmayer v. State, 754 So.2d 71 (Fla. 4th DCA 2000), wherein the district court certified the following question:
When suspects who are considering waiving their Miranda rights ask law enforcement officers if they should invoke the right to counsel, what does Almeida require of the officers?
Glatzmayer, 754 So.2d at 74. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We answer as explained below and quash Glatzmayer.

I. FACTS
The relevant facts are set forth in the trial court's order denying Glatzmayer's motion to suppress:
In the early morning hours of February 15, 1998, Eric Schunk was shot and killed in the Rainberry Woods Park in Delray Beach, Florida. When the police arrived, the defendant, Brian Glatzmayer, was at the scene and believed to be a witness to what he claimed was a drive-by shooting. After speaking with Glatzmayer the police felt that the physical evidence at the scene was inconsistent with his version of the incident. Through follow up investigation, Glatzmayer and three other individuals became suspects in the murder of Eric Schunk.

*300 On February 16, 1998, Detective Ed Flynn of the Delray Beach Police department went to the home of a witness to show her a photo lineup. The defendant was present and told Flynn that he wanted to change his statement. He was taken to the police department and [Detective Flynn] along with Sgt. Robert Brand questioned him. He was advised of his Miranda Warnings from a standard rights card which was signed by the defendant. After a brief statement, a formal taped statement was taken. Pursuant to the agreement of the parties, the Court reviewed that statement prior to the hearing. The defendant confessed to his involvement in the murder of Eric Schunk.
Both officers testified that the defendant was not promised or threatened to give a statement, did not appear to be under the influence of any alcohol or drugs, and that he freely and voluntarily spoke with them. After the officers took a statement from him, he was asked if he would put the statement on tape. At that point the defendant asked the officers if "they thought he should get a lawyer?" The officers responded that it was his choice. At that point the defendant [who was eighteen years old] requested to speak with his mother. She was located by the officers and given an opportunity to speak with her son alone for about a half hour. After speaking with his mother, the defendant gave a taped statement. On the tape itself the defendant stated that he understood his rights and that he was not threatened or promised anything. The defense did not present any testimony.
Based on the totality of the testimony presented and the tape recorded statement of the defendant, the Court finds that the statement given by the defendant was done so after he was properly advised of his Miranda Warnings and that it was done so freely and voluntarily. The evidence demonstrates that the defendant did not invoke his right to counsel, that his question was at best an equivocal request for counsel, and that the officers were correct in telling the defendant that whether or not he should get a lawyer was his choice. Based upon the authority of State v. Owen, 696 So.2d 715 (Fla.1997), Slawson v. State, 619 So.2d 255 (Fla.1993); Davis v. United States, 512 U.S. 452 [, 114 S.Ct. 2350, 129 L.Ed.2d 362] (1994), it is:
Ordered and adjudged that the Defendant's Motion to Suppress is Denied.
(Emphasis added.)
The taped statement was admitted at trial and Glatzmayer was convicted of first-degree felony murder and attempted robbery without a firearm and was sentenced to concurrent terms of life imprisonment without the possibility of parole and twelve years imprisonment, respectively. The district court reversed the convictions based on this Court's then-recent decision in Almeida v. State, 737 So.2d 520 (Fla.1999)[1], which was unavailable to the trial court at the time of the suppression hearing.[2] The district court certified the above question.

*301 II. THE APPLICABLE LAW
Suppression issues are extraordinarily rich in diversity and run the gamut from (1) pure questions of fact,[3] to (2) mixed questions of law and fact,[4] to (3) pure questions of law.[5] Reviewing courts must exercise care when examining such issues, for while the issues themselves may be posed in broad legal terms (e.g., whether a suspect was "in custody," whether conduct by police constituted "interrogation"), the actual ruling is often discrete and factual (e.g., whether police did in fact tell a suspect he was free to go, whether police did in fact ask a suspect if he committed the crime). Appellate courts cannot use their review powers in such cases as a mechanism for reevaluating conflicting testimony and exerting covert control over the factual findings. As with all trial court rulings, a suppression ruling comes to the reviewing court clad in a presumption of correctness as to all fact-based issues,[6] and the proper standard of review depends on the nature of the ruling in each case.[7]
*302 The law in Florida governing custodial utterances has undergone significant change in recent years:
This Court in Long v. State, 517 So.2d 664, 667 (Fla.1987), held that if in the course of custodial interrogation a suspect makes an utterance that may be an attempt to invoke his or her rights, police may "continue questioning for the sole purpose of clarifying the equivocal request." Subsequent to Long, the United States Supreme Court in Davis v. United States, 512 U.S. 452 [, 114 S.Ct. 2350, 129 L.Ed.2d 362] (1994), held that if a suspect initially waives his or her rights, the suspect thereafter must clearly invoke those rights during the ensuing interview.... This Court was then faced in State v. Owen, 696 So.2d 715 (Fla.1997), with the issue of whether to adopt the Davis rationale in Florida.
Almeida, 737 So.2d at 522-23 (citations omitted). The particular statements at issue in State v. Owen, 696 So.2d 715 (Fla. 1997), were equivocal utterances[8] and the Court concluded that to require police to stop an interview and clarify such statements "places too great an impediment upon society's interest in thwarting crime." Owen, 696 So.2d at 719. The Court followed Davis:
Thus, we hold that police in Florida need not ask clarifying questions if a defendant who has received proper Miranda warnings makes only an equivocal or ambiguous request to terminate an interrogation after having validly waived his or her Miranda rights.
Owen, 696 So.2d at 719.
Subsequently, the Court in Almeida v. State, 737 So.2d 520 (Fla.1999), was faced not with an equivocal utterance but with a clear question concerning the suspect's rights after the suspect earlier had waived his rights:
Q. All right. Prior to us going on this tape here, I read your Miranda rights to you, that is the form that I have here in front of you, is that correct? Did you understand all of these rights that I read to you?
A. Yes.

*303 Q. Do you wish to speak to me now without an attorney present?

A. Well, what good is an attorney going to do?

Q. Okay, well you already spoke to me and you want to speak to me again on tape?
Q. (By Detective Allard) We are, we are just going to talk to you as we talked to you before, that is all.
A. Oh, sure.
Almeida, 737 So.2d at 522. The Court examined the legal interests at stake and concluded that no valid reason exists for not answering such a question:
No valid societal interest is served by withholding such information. Indeed, both sides can only benefit from disclosure: Disclosure ensures that any subsequent waiver will be knowing and intelligent, and it reaffirms those qualities in a prior waiver. Nondisclosure, on the other hand, is doubly harmful: It exacerbates the inherently coercive atmosphere of the interrogation session, and it places in doubt the knowing and intelligent nature of any waiverwhether prior or subsequent.
Almeida, 737 So.2d at 525 (footnote omitted). The Court ruled thusly:
Accordingly, we hold that if, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer.
Almeida, 737 So.2d at 525. To the extent that officers may be uncertain how to respond to a particular question, they may where appropriatereadvise the suspect of his or her rights.[9]

III. THE PRESENT CASE
Although the trial court below did not have the benefit of Almeida when it decided the suppression issue, this Court generally applies the law as it exists at the time the Court conducts its review.[10]Almeida thus controls the present case. Application of the legal standard announced in Almeida to the trial court's findings of historical fact presents an issue that is amenable to de novo analysis by this Court.[11]
During the suppression hearing, officers Flynn and Brand testified for the State concerning the circumstances surrounding Glatzmayer's utterance. Flynn testified as follows on direct examination:
A. We were at the end of the interview when we felt that everything had been explained, all the evidence had been explained and he had given a truthful statement. We then asked him to put it on tape.
Q. And what did he say at that time?

*304 A. He said that he wanted to speak to his mother first.
Q. All right, did he say anything else?
A. He had no objections to it. He was ready to comply with it.
Q. Did he ever mention anything as far as an attorney?
A. No. I am sorry, he did ask if we thought he should have an attorney.

Q. Do you recall in what sequence his statementin other words, I want to talk to my mom
A. I am sorry, I believe he said that he wanted-if we thought he should have an attorney.

Q. And what did you say?
A. And we said, that's not our decision to make, that yours, it's up to you.

Q. What did he say?
A. And he, he said, well, maybe I should just talk to my mother, something to that effect.
Q. And what did you do at that point?
A. We triedwe contacted his mother.
Q. Did his mother come down to the police department?
A. Yes, she did.
. . . .
Q. After he had an opportunity to meet with his mother, what occurred at that point?
A. We then took a taped statement.
(Emphasis added.) Brand's testimony was consistent with Flynn's testimony.[12]
Applying the analytical model set forth in Almeida to the above dialogue, we first must determine whether Glatzmayer was in fact referring to his right to counsel. As noted above, Glatzmayer asked the officers if they thought he should have an attorney. That utterance was made under the following conditions: (1) during a respite in the custodial interrogation session; (2) immediately after Glatzmayer had revealed to the officers highly incriminating information about his involvement in the crime; and (3) in direct response to the officers' request to memorialize his incriminating statements on tape. Under these circumstances, it is reasonable to assume that Glatzmayer was concerned about his legal rights and was referring to his right to counsel.
Next, the Court must determine whether the utterance was a bona fide question calling for an answer. The testimony of Officers Flynn and Brand reveals that, based on their perception of the utterance, they believed it to be a question. Flynn testified that Glatzmayer "did ask if we thought he should have an attorney," and Brand testified that "he asked our opinion, whether he needed an attorney." The officers responded to the utterance as if it were a bona fide question calling for an answer. The trial court too found the utterance to be a question: "[H]is question was at best an equivocal request for counsel." This Court thus may reasonably conclude that the utterance was a genuine question; it was not a rumination or a rhetorical question. Glatzmayer was seeking a frank answer.
*305 Finally, the Court must determine whether the officers made "a good-faith effort to give a simple and straightforward answer." Almeida, 737 So.2d at 525. As noted above, the officers responded to Glatzmayer's question by telling him that the decision as to whether he should have a lawyer was not theirs to make, that it was his decision. Glatzmayer in effect was soliciting the officers' subjective opinion, and the officers told him that their opinion was beside the point, that he needed to make up his own mind. Their response was simple, reasonable, and true. Unlike the situation in Almeida, the officers did not engage in "gamesmanship"; they did not try "to give an evasive answer, or to skip over the question, or to override or `steamroll' the suspect." Almeida, 737 So.2d at 525. None of the policy concerns implicated in Almeida were violated here. By responding frankly, the officers acted to assuage the inherently coercive atmosphere of the interrogation session and to reaffirm the validity of Glatzmayer's prior waiver.

IV. CONCLUSION
In sum, nothing in Almeida requires that law enforcement officers act as legal advisors or personal counselors for suspects.[13] Such a task is properly left to defense counsel.[14] To require officers to advise and counsel suspects would impinge on the officers' sworn duty to prevent and detect crime and enforce the laws of the state.[15] All that is required of interrogating officers under Almeida and Owen is that they be honest and fair when addressing a suspect's constitutional rights:
In sum, whenever constitutional rights are in issue, the ultimate bright line in the interrogation room is honesty and common sense.
Almeida, 737 So.2d at 526. In the present case, officers Flynn and Brand conducted themselves in an eminently forthright manner in addressing Glatzmayer's rights. This conclusion is consonant with numerous appellate court decisions throughout the nation.[16] The district court below erred in ruling otherwise.
*306 Based on the foregoing, we answer the certified question as explained herein and quash the district court decision below.
It is so ordered.
HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
WELLS, C.J., concurs in result only.
NOTES
[1] See Almeida v. State, 737 So.2d 520, 525 (Fla.1999) (holding that if a suspect during custodial interrogation asks a clear question concerning his or her rights "the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer").
[2] The trial court's order denying Glatzmayer's motion to suppress his confession was signed December 11, 1998; Almeida was decided July 8, 1999.
[3] See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 248-49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("Voluntariness [of a consent to search] is a question of fact to be determined from all the circumstances...."); Jorgenson v. State, 714 So.2d 423, 426 (Fla.1998) ("The question of whether a consent [to search] is voluntary is a question of fact to be determined from the totality of the circumstances."); Washington v. State, 653 So.2d 362, 364 (Fla.1994) (same); Reynolds v. State, 592 So.2d 1082, 1086 (Fla.1992) (same); see generally United States v. Mendenhall, 446 U.S. 544, 557-58, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ("The question whether the respondent's consent to accompany the agents was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances... and the totality of the evidence in this case was plainly adequate to support the District Court's finding that the respondent voluntarily consented to accompany the officers to the DEA office.").
[4] See, e.g., Ramirez v. State, 739 So.2d 568, 574 (Fla.1999) ("The question of whether a suspect is in custody is a mixed question of law and fact.").
[5] See, e.g., State v. Brea, 530 So.2d 924, 925 (Fla.1988) ("The trial court agreed that the co-conspirator exception to the hearsay rule no longer applied and granted Brea's motion to suppress the tape-recorded statement of Perez."); see generally Franqui v. State, 699 So.2d 1312 (Fla.1997) (discussing the admissibility of a codefendant's confession in light of exceptions to the hearsay rule); State v. Owen, 696 So.2d 715 (Fla.1997) (discussing the admissibility of the defendant's confession in light of an intervening ruling by the United States Supreme Court).
[6] See, e.g., San Martin v. State, 717 So.2d 462, 469 (Fla.1998) ("A trial court's ruling on a motion to suppress comes to this Court clothed with a presumption of correctness and, as the reviewing court, we must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling."); Escobar v. State, 699 So.2d 984, 987 (Fla.1997) ("A trial court's ruling on a motion to suppress is presumptively correct."); Rhodes v. State, 638 So.2d 920, 926 (Fla.1994) ("[A] ruling on [a] motion to suppress is presumed correct and will be upheld if supported by the record."); Jones v. State, 612 So.2d 1370, 1373 (Fla.1992) ("A trial court's ruling on a motion to suppress is presumed to be correct."); Johnson v. State, 608 So.2d 4, 9 (Fla.1992) ("the ruling of the trial court on a motion to suppress comes to us clothed with a presumption of correctness and we must interpret the evidence and reasonable inference[s] and deductions in a manner most favorable to sustaining the trial court's ruling."); Savage v. State, 588 So.2d 975, 979 (Fla.1991) ("A trial court's ruling on a motion to suppress is presumptively correct.").
[7] The following standards of review apply to trial court rulings in general: If the ruling consists of a pure question of fact, the ruling must be sustained if supported by competent substantial evidence. See, e.g., Philip J. Padovano, Florida Appellate Practice § 9.6 (2nd ed.1997). If the ruling consists of a mixed question of law and fact addressing certain constitutional issues (e.g., probable cause, reasonable suspicion, the "in custody" requirement under Miranda, ineffectiveness of counsel), the ultimate ruling must be subjected to de novo review but the court's factual findings must be sustained if supported by competent substantial evidence. See, e.g., Stephens v. State, 748 So.2d 1028 (Fla.1999). If the ruling consists of a mixed question of law and fact addressing other issues (e.g., the dependency of a child, the propriety of a departure sentence, the presence of an aggravating circumstance), the ruling must be sustained if the trial court applied the right rule of law and its ruling is supported by competent substantial evidence. See, e.g., In re M.F., 770 So.2d 1189, 1192 (Fla.2000); Banks v. State, 732 So.2d 1065, 1067 (Fla.1999); Willacy v. State, 696 So.2d 693, 695 (Fla.1997). If the ruling consists of a pure question of law, the ruling is subject to de novo review. See, e.g., Philip J. Padovano, Florida Appellate Practice § 9.4 (2nd ed.1997).
[8] This Court in Almeida explained the circumstances under which the two statements in Owen were rendered:

The defendant in Owen had initially waived his Miranda rights and during the ensuing interrogation session made two equivocal statements. First, when one of the detectives asked whether he had deliberately targeted the victim's house, Owen responded, "I'd rather not talk about it." Later, when the officer asked him where he had put a bicycle, Owen said, "I don't want to talk about it." In both statements it was unclear whether Owen was referring to the immediate topic of discussion, i.e., the house and the bicycle, or to the underlying right to cut off questioning. Officers did not stop to clarify either statement.
Almeida, 737 So.2d at 523 (footnote omitted).
[9] See generally Davis v. United States, 512 U.S. 452, 460, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) ("[T]he primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves."). Cf. Slawson v. State, 619 So.2d 255, 258 (Fla. 1993) (holding that reading a suspect his rights was a proper response to question, "What about an attorney?"); Diaz v. Senkowski, 76 F.3d 61, 63 (2d Cir.1996) (holding that the statement, "You have been advised of your rights," was a proper response to the question, "Do you think I need a lawyer?").
[10] See, e.g., Cantor v. Davis, 489 So.2d 18, 20 (Fla.1986) ("An appellate court is generally required to apply the law in effect at the time of its decision.").
[11] Cf. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (applying newly formulated standards for ineffectiveness of counsel to the factual findings of the trial court).
[12] Officer Brand testified as follows on direct examination:

Q. What did he say, as best as you can recall?
A. The best I recall is, he asked our opinion, whether he needed an attorney.
Q. What did you tell him?
A. Our response was, basically, that we are not there to give him advice on whether he needs one or not, that would be strictly up to you. And at that point, he told us that he would go ahead and give us a statement but he wanted to talk to his mother first.
(Emphasis added.)
[13] Cf. State v. Craig, 237 So.2d 737, 740 (Fla. 1970) ("The Miranda decision does not require the interrogator to give legal advice, but only that defendant is told his constitutional rights and makes an intelligent waiver of counsel. The determination for need of counsel is the defendant's prerogative.").
[14] The Court in Johnson v. State, 660 So.2d 637, 642 (Fla.1995), explained:

Police are not required to disclose every possible ramification of a waiver of rights to a detainee apart from those general statements now required by Miranda and its progeny. Nor are police required to tell detainees what may be in their personal best interests or what decision may be the most advantageous to them personally. Under our system, law enforcement officers are representatives of the state in its efforts to maintain order, and the courts may not impose upon them an obligation to effectively serve as private counselors to the accused. The latter is the obligation of private attorneys or public defenders and certainly must not be shouldered by those whose job it is to police our streets.
[15] See generally ch. 112, part IV, Fla. Stat. (1997).
[16] See, e.g., Diaz v. Senkowski, 76 F.3d 61, 63 (2d Cir.1996) (admitting the defendant's confession where he asked during interrogation, "Do you think I need a lawyer?" and the officer responded, "You have been advised of your rights."); United States v. Oghuehi, 18 F.3d 807, 813 (9th Cir.1994) (admitting the defendant's confession where he asked during interrogation, "Do I need a lawyer?" and the officer responded, "that was a question that only he could answer"); People v. Oaks, 169 Ill.2d 409, 215 Ill.Dec. 188, 662 N.E.2d 1328, 1347 (1996) (admitting the confession where the defendant asked, "Should I see a lawyer?" and the officer responded, "That's up to you."); State v. Bailey, 256 Kan. 872, 889 P.2d 738, 743 (1995) (admitting the confession where the defendant asked "if he needed a lawyer" and the officers responded, "that was not a decision for us to make, that was his decision"); State v. Thomas, 711 So.2d 808, 813 (La.Ct.App.1998) (admitting the confession where the defendant asked, "But do I-do I need a lawyer?" and the officers responded, "That's up to you."); State v. Jones, 914 S.W.2d 852, 860 (Mo.Ct.App.1996) (admitting the confession where the defendant asked, "Do I need an attorney?" and the officer responded, "I'm not an attorney. I'm an investigator."); State v. Davis, 124 N.C.App. 93, 476 S.E.2d 453, 457 (1996) (admitting the confession where "the defendant asked if he needed a lawyer and was told that it was his decision to make"); State v. Greybull, 579 N.W.2d 161, 162 (N.D.1998) (admitting the confession where the defendant asked, "Do I need a lawyer?" and the officer replied, "that's up to you").