890 So.2d 389 (2004)
Mark ALVAREZ, Appellant,
v.
STATE of Florida, Appellee.
No. 1D03-4930.
District Court of Appeal of Florida, First District.
December 23, 2004.
*391 Nancy A. Daniels, Public Defender; and William C. McLain, Assistant Public Defender, Tallahassee, for Appellant.
Charlie Crist, Attorney General; and Felicia A. Wilcox, Assistant Attorney General, Tallahassee, for Appellee.
BROWNING, J.
Mark Alvarez appeals his conviction of one count of second-degree murder and one count of second-degree arson. Alvarez contends that he is entitled to a new trial because the trial court fundamentally erred in misreading the jury instruction on second-degree murder in a manner that relieved the State of having to prove an essential, disputed element; in denying the motion to suppress Appellant's oral and written statements to law-enforcement officers allegedly made in violation of Appellant's constitutional right to remain silent and right to counsel; and in refusing to give a requested special jury instruction directing the jury on how to evaluate the testimony of in-custody witnesses. We affirm the judgment and sentence.
The State's information charged Alvarez with the August 5, 2001, second-degree murder of Crisie Mejias and August 6, 2001, second-degree arson upon a Ford Escort automobile belonging to the victim's parents. A grand jury returned an indictment charging the first-degree murder of Miss Mejias and second-degree arson of the automobile, superseding the information. The initial jury trial ended in a mistrial. In the second trial, the State prosecuted the first count on alternative theories of premeditated murder and felony murder (based on the commission or attempted commission of sexual battery upon the victim). The defense admitted that Alvarez had engaged in consensual, *392 albeit "rough," sexual intercourse with the victim and had set afire the automobile (under a principal theory). The jury found Alvarez guilty of the lesser-included offense of second-degree murder on the first count and guilty of arson, as charged, on the second count. The trial court classified Alvarez as a habitual felony offender and sentenced him to life and to 30 years' incarceration, respectively, on the two counts.
In his first issue, Alvarez contends the trial court fundamentally erred in misreading a jury instruction in a manner that relieved the prosecution from having to prove an essential, disputed element of the offense, in violation of Alvarez's right to due process. See Reed v. State, 837 So.2d 366 (Fla.2002). Upon our court's relinquishment of jurisdiction, the trial court held a hearing to reconstruct the record. The judge, Alvarez and his attorney, and the prosecutor heard the trial court reporter testify that the judge had correctly read the jury instruction aloud at trial. The error in the instruction challenged by Alvarez was typographical, i.e., an audiotape played at the hearing demonstrated that the judge had correctly read the instruction aloud, but the court reporter had erred in transcribing it. The parties and the trial judge having agreed that the instruction was correctly pronounced, and absent any allegation of error in the written instruction given to the jury, we find this issue is moot.
Alvarez's second issue asserts that the trial court erred in denying the motion to suppress certain of Alvarez's oral and written statements made to detectives while in custodial interrogation at the police station on August 8, 2001, in violation of Alvarez's right to remain silent and right to counsel.
A trial court's ruling on a motion to suppress comes to us clothed with a presumption of correctness and, as the reviewing court, we must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling.
Connor v. State, 803 So.2d 598, 605 (Fla.2001), quoting Murray v. State, 692 So.2d 157, 159 (Fla.1997). The trial court's ruling on a motion to suppress a criminal defendant's statement, where the issue is whether the surrounding circumstances comport with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), presents a mixed question of law and fact. See State v. Glatzmayer, 789 So.2d 297 (Fla.2001). The United States Supreme Court has held that mixed questions of law and fact that ultimately determine constitutional rights are to be reviewed by appellate courts according to a two-step approach: we review the trial court's findings of historical fact only for clear error and give appropriate weight to the court's inferences but conduct a de novo review of the constitutional issue and whether the trial court correctly applied the law to the facts. See Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); Connor, 803 So.2d at 605-08; State v. Shaw, 784 So.2d 529 (Fla. 1st DCA 2001); State v. Setzler, 667 So.2d 343, 346 (Fla. 1st DCA 1995).
Police custodial interrogation triggers the need to give Miranda warnings. See Miranda, 384 U.S. at 444, 86 S.Ct. 1602; J.G. v. State, 883 So.2d 915, 922 (Fla. 1st DCA 2004). Under Miranda, 384 U.S. at 445, 86 S.Ct. 1602, a suspect undergoing custodial interrogation has the rights to stop the questioning anytime by asserting the right to remain silent. See Amends. V & XIV, U.S. Const.; Art. I, § 9, Fla. Const.; Traylor v. State, 596 So.2d 957, 965-66 (Fla.1992). Having considered all the evidence submitted on the *393 motion to suppress, the trial court correctly concluded that the police did not violate Alvarez's right to remain silent or right to counsel, for Alvarez never unequivocally invoked either of these constitutional rights. In fact, Alvarez waived his right to remain silent and right to counsel, with a full awareness of the nature of the rights being abandoned and the consequences of doing so. The record is devoid of any police misconduct or coercive tactics. Accordingly, the trial court's ruling that Alvarez's post-Miranda statements were given freely and voluntarily is amply supported by the record.
In the course of investigating Miss Mejias' death, Detective McHale, of the Jacksonville Sheriff's Office, met with Alvarez after two other detectives brought Alvarez to the police station. After asking some general background questions to ascertain whether Alvarez had the capacity and education to read and understand the rights to be given, McHale gave Alvarez Miranda warnings. Specifically, McHale read aloud Alvarez's rights and asked him to initial each section and to sign the bottom of the rights form if he understood his rights. Alvarez signed the form, and Detectives McHale and Nemeth signed as witnesses. Alvarez then freely and voluntarily waived his Miranda right and agreed to talk to McHale as Nemeth took written notes of the interview.
In pertinent part, Alvarez told McHale about how he had met the victim at a salsa dance contest at Crawdaddy's, where Alvarez worked security, and afterwards went with her and his friend Omar Vasquez to Denny's Restaurant. When he first signed the rights form, Alvarez had not been told specifically the subject(s) about which he would be questioned. After Detective McHale asked if everyone had gone to breakfast after the equipment was dismantled at the dance, Alvarez remarked: "I'm thinking this is about Cris [the victim]." Alvarez said that the victim had driven him from Denny's to Alvarez's apartment. According to the detective, Alvarez then said: "From here on, I'm not supposed to talk about it. Mr. Stanfield told me not to talk about the rest of this." The trial court heard testimony that Alvarez never identified Mr. Stanfield other than by name, and the detectives did not know his identity. At no time did Alvarez indicate that Stanfield is a lawyer. Detective McHale knew that Alvarez had contacted and talked to several individuals after the victim died. McHale had been told by a friend of Alvarez that Alvarez had contacted, or made an appointment with, or had gone to see an attorney named Sam. The detective did not construe Alvarez's comments as an invocation of a constitutional right. Up to that point, Alvarez had been telling a story. When Alvarez mentioned Mr. Stanfield, Detective McHale, in an abundance of caution, wanted to make sure Alvarez was giving the account voluntarily and was not invoking a constitutional right. McHale said to Alvarez: "At the beginning you told me you wanted to tell me what happened. Now are you saying you don't want to tell me what happened?" Alvarez responded: "No, no, no. I want to tell you what happened." When Detective McHale was asked to describe this sequence of events more specifically, he testified that he had informed Alvarez that he (McHale) had interviewed a lot of people, including friends to whom Alvarez had told his story of what happened to the victim. McHale advised Alvarez that this was Alvarez's only opportunity to tell his own side of the story. Alvarez was told that he could "listen to this individual" (apparently, the detective was referring to Mr. Stanfield) or he could give his own account of what happened. Alvarez answered: "Let me explain. I said that a certain incident *394 made me look bad and made her look bad." At that point, the detective said "let's continue," but first he stopped the interview and re-read Alvarez Miranda rights using a second, identical rights form, which Alvarez signed. Detective McHale told Alvarez that if he was agreeing to talk further, then he should specifically state this on the rights form. Alvarez did so on the bottom right side of the form. McHale testified that Alvarez was not threatened or promised anything as an inducement to talk. Alvarez never requested a lawyer and never indicated unequivocally that he did not want to talk. After Alvarez signed the second rights form, the detective asked him: "Are you sure you want to talk?" and Alvarez commenced telling his story again, thereby knowingly, voluntarily waiving his rights. See Davis v. United States, 512 U.S. 452, 462, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (affirming holding that suspect's remark to Naval Investigative Service agents, "Maybe I should talk to a lawyer," was not request for counsel, and agents were not required to stop questioning suspect but could properly clarify whether suspect wanted counsel); Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
Later in the interview, Alvarez denied having killed Miss Mejias, but he told Detective McHale that it had happened during sex. Alvarez admitted placing the victim's body into a suitcase, placing it in the automobile, and setting the vehicle on fire. Alvarez also gave a written statement to Detectives McHale and Nemeth and signed a consent form for his apartment to be searched. The entire interview took slightly more than two hours, with a short break while McHale went out to get a second Miranda rights form. Detective Nemeth's testimony regarding what happened during the interview is consistent with Detective McHale's testimony in all material respects.
After a suspect knowingly and voluntarily waives Miranda rights, a law-enforcement officer may continue questioning unless and until the suspect clearly, unequivocally requests an attorney. See Davis, 512 U.S. at 458, 114 S.Ct. 2350. In other words, the police must immediate cease questioning a suspect who has clearly asserted the right to have counsel present during custodial interrogation. See Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880. The test is objective; that is, a suspect must articulate the desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent. See Coleman v. Singletary, 30 F.3d 1420, 1424 (11th Cir.1994); United States v. Scurlock, 52 F.3d 531, 536-37 (5th Cir.1995). In Florida, law-enforcement officers have no duty to terminate questioning, or to limit themselves only to asking clarifying questions, when a suspect makes an equivocal invocation of a Miranda right. See Owen v. State, 862 So.2d 687, 697 (Fla.2003). Therefore, merely equivocal and ambiguous invocations of the right to remain silent require neither a cessation of the interview nor the resolution of the ambiguity. See Ford v. State, 801 So.2d 318 (Fla. 1st DCA 2001); State v. Moya, 684 So.2d 279 (Fla. 5th DCA 1996).
The instant record demonstrates that Alvarez did not make an unequivocal, unambiguous invocation of his right to remain silent or his right to counsel. See Owen, 862 So.2d at 696-98 (holding that defendant's responses to police during interview regarding events surrounding capital murder that he would "rather not talk about it," and "I don't want to talk about it" were equivocal invocation of right to remain silent, so that police officers had no duty to terminate questioning or limit *395 themselves to asking only clarifying questions). Like the defendant in Owen, Alvarez failed to articulate a desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would have understood Alvarez's statements to be an assertion of a constitutional right. See Medina v. Singletary, 59 F.3d 1095, 1101 (11th Cir.1995) (finding defendant's recorded statement to police was voluntary even though, after tape recorder was turned on following initial unrecorded interview, defendant initially replied "no" when asked if he wanted to talk to detective; detective immediately asked defendant "You don't want to talk to us or you do want to talk to us?" to which defendant responded by indicating he wanted to continue interview, and defendant had talked freely before recorder was used and had replied "yes" when asked whether record could be turned on). Because the record established that Alvarez's post-Miranda oral and written statements were given freely, knowingly, and voluntarily after waiving the right to remain silent and the right to counsel, the trial court did not err in denying the motion to suppress.
In his third and final issue, Alvarez challenges the trial court's refusal to give a requested special jury instruction on how to evaluate the testimony of in-custody informant witnesses. The State presented five in-custody informant witnesses. The standard jury instruction, which was given by the court, states:
It is to the evidence introduced in this trial, and to it alone, that you are to look for that proof. A reasonable doubt as to the guilt of the defendant may arise from the evidence, conflict in the evidence or the lack of evidence. If you have a reasonable doubt, you should find the defendant not guilty. If you have no reasonable doubt, you should find the defendant guilty.
It is up to you to decide what evidence is reliable. You should use your common sense in deciding which is the best evidence and which evidence should not be relied upon in considering your verdict. You may find some of the evidence not reliable or less reliable than other evidence. You should consider how the witnesses acted as well as what they said.
Some things you should consider are: Did the witness seem to have an opportunity to see and know the things about which the witness testified; did the witness seem to have an accurate memory; was the witness honest and straightforward in answering the attorney's questions; did the witness have some interest in how the case should be decided; does the witness' testimony agree with the other testimony and other evidence in the case; has the witness been offered or received any money, preferred treatment or other benefit in order to get the witness to testify; had any pressure or threat been used against the witness that affected the truth of the witness' testimony; did the witness at some other time make a statement that is inconsistent with the testimony he or she gave in court; was it proved that the witness had been convicted of a crime; was it proved that the general reputation of the witness for telling the truth and being honest was bad.
You may rely upon your own conclusions about the witness. A juror may believe or disbelieve all or any part of the evidence or the testimony of any witness.
Fla. Std. Jury Instr. (Crim.) 3.9. The requested alternative special instructions state:
Request No. 1: You should use great caution in relying on the testimony of a witness who is an in-custody informant. This is particularly true when there is *396 no other evidence tending to agree with what the witness days about the defendant.
However, if the testimony of such a witness convinces you beyond a reasonable doubt of the defendant's guilt, or the other evidence in the case does so, then you should find the defendant guilty.
Request No. 2: The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case.
The standard jury instruction is presumed correct and generally is preferred over a special instruction. See Stephens v. State, 787 So.2d 747, 755 (Fla.2001). Alvarez has the burden of demonstrating the trial court abused its discretion in reading the standard instruction. See id. at 755-56. To be entitled to the special instruction, Alvarez must establish 1) that "the special instruction was supported by the evidence"; 2) that "the standard instruction did not adequately cover the theory of defense"; and 3) that "the special instruction was a correct statement of the law and not misleading or confusing." See id. at 756.
Alvarez failed to prove that the standard instruction given did not adequately cover his theory of defense. The defense provided no Florida authority to support giving the special instruction. A comparison of the standard instruction given and the alternative special instructions denied indicates that all of them instruct the jury on its duty to determine what evidence is reliable. The standard instruction notes that a reasonable doubt as to a defendant's guilt can arise from the evidence, from evidentiary conflicts, or from the lack of evidence. The jurors were carefully instructed that if they had a reasonable doubt, they should find Alvarez not guilty. The jury was told to use its common sense in deciding what is best evidence and which evidence is unreliable. The jury was urged to consider how the witnesses acted and what they said. Among the relevant considerations in assessing reliability are: 1) whether the witness had the opportunity to see or know the things about which he or she testified; 2) whether the witness' memory seemed accurate; 3) whether the witness was honest and straightforward in responding to the attorneys' questions; 4) whether the witness had some interest in the outcome of the case; 5) whether the witness' testimony agreed with other testimony and evidence in the case; 6) whether the witness had been offered or received any money, preferred treatment, or other benefit as an inducement to testify; 7) whether any pressure or threat had been used against the witness so as to affect the truth of the witness' testimony; 8) whether the witness had, at some other time, made a statement inconsistent with the witness' in-court testimony; 9) whether it was proved that the witness had been convicted of a crime; and 10) whether it was proved that the witness' general reputation for telling the truth and being honest was bad. The instruction given apprised the jury of all these proper considerations in determining witness reliability. The jury was told that it could believe or disbelieve all or any part of the evidence or the testimony of any witness.
The jury was not specially instructed that it should use "great caution *397 in relying on the testimony of a witness who is an in-custody informant," especially where "there is no other evidence tending to agree with what the witness says about the defendant." Likewise, the jury was not specially instructed that it should view an in-custody informant's testimony "with caution and close scrutiny." The suggestion to evaluate the extent to which an in-custody witness' testimony may have been influenced by receiving, or expecting to receive, "any benefits from the party calling the witness" was generally addressed in the standard instruction given. In other words, the standard instruction adequately covered the theory of defense and the legal standard for evaluating witnesses without unnecessarily or unfairly singling out in-custody witnesses for different treatment or bolstering the defense's case. Where the Florida Standard Jury Instruction adequately apprises the jury as to the law and evidence, it is proper to give the standard instruction rather than a requested special instruction. See Carpenter v. State, 785 So.2d 1182, 1200 (Fla.2001). The trial court did not abuse its discretion in reading the standard instruction.
We cannot disregard those portions of the record demonstrating that defense counsel missed no opportunity in opening statement to inform the jury that the State would be presenting "snitches." Defense counsel urged the jury to consider these "dirty half-dozen" witnesses' motives for testifying and their inconsistent stories. In closing argument, the defense characterized "these guys" as "slick" and "professional career criminals." Questioning those witnesses' reasons for testifying against Alvarez, defense counsel remarked: "These days the State can purchase the truth from an in-custody witness, informants." Counsel suggested the State was "paying them ... something more valuable" than "large sums of money": their "liberty" or "early outs" from confinement. In fact, the defense lamented that "[o]nly one side is permitted to purchase the truth"; counsel repeatedly questioned the fairness of this system. Counsel described the character of the in-custody witnesses' testimony as "truth with a cloud of suspicion over it." The defense wondered how many years such witnesses hoped to get subtracted from their sentences, or whether their charges would be reduced, as a result of testifying for the State. Given this barrage of warnings from defense counsel about the unreliability of the testimony of the in-custody witnesses presented by the State, any error in giving the standard instruction would have been harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
For all these reasons, we AFFIRM Alvarez's conviction and sentences.
LEWIS and POLSTON, JJ., CONCUR.