MAASS, ELIZABETH T„ Associate Judge.
 

 Curtis Tenney and Elizabeth Johnson were murdered on January 8, 2006. Mark Alvarez confessed to the murders. He was convicted of two counts of first degree murder with a firearm and one count of second degree arson following a jury trial. He raises five points on appeal. First, he argues that his Miranda
 
 [1]
 
 warning failed to tell him he had the right to appointed counsel before questioning. Second, he argues that his confession occurred only after he unambiguously invoked his right to remain silent. Third, he claims that there was insufficient evidence to support the standard jury instruction on principals, which the state then used to make an improper closing argument. Fourth, he maintains that the trial court failed to inquire into an apparent conflict of interest between his counsel and him. Finally, he argues that the trial court improperly threatened a witness with prosecution for perjury. We affirm, but write to address Alvarez’s contention that the trial court erred in denying the motion to suppress his confession and giving the standard principals instruction.
 

 I. Motion to Suppress
 

 A. Adequacy of Constitutional Warning
 

 Tenney and Johnson died of single gun shots to the head the night of January 8, 2006. Their bodies were found in Elizabeth’s burned out car on an isolated stretch of road in Okeechobee County. Law enforcement sought Alvarez for questioning early in the investigation. He was located April 3, 2006.
 

 He was first questioned by Detective T.J. Brock, the murder investigation’s lead detective, early that afternoon. Detective Brock had Alvarez confirm that he was not under the influence of alcohol or drugs, spoke English, and could read. Brock told Alvarez that “before you answer any questions, the [Constitution requires me to inform you that you have the right to remain silent.” Alvarez indicated that he understood. Brock then gave Alvarez a preprinted Okeechobee County rights form and asked him to read it aloud. The form read:
 

 You have the right to remain silent. Do you understand that right?
 

 Anything you say may be used as evidence against you in Court. Do you understand?
 

 You have the right to call or obtain an attorney
 
 at this time and,
 
 have one present now or at any time during questioning. Do you understand that right?
 

 
 *741
 
 If you cannot afford to hire an attorney, the Court will appoint one for you without cost. Do you understand?
 

 If you decide to answer questions now, you have the right to stop answering at anytime during questioning. Do you understand that right?
 

 Knowing these rights, do you wish to talk with me or us at this time?
 

 Alvarez responded “yes” to each question.
 

 (Emphasis added).
 

 Alvarez then submitted to a 54 minute interview with Brock. During that interview Alvarez said he had smoked pot with Curtis the night of the murders, but denied having killed him or knowing who did.
 

 After that interview, Alvarez was asked to take a voice stress test with Detective Marty Faulkner. He agreed. The voice stress test began mid-afternoon and lasted 2 hours and 35 minutes. At the beginning of the interview Alvarez was once again given the preprinted
 
 Miranda
 
 rights form and asked to waive his rights. In addition, Faulkner told Alvarez:
 

 Let me advise you of your
 
 Miranda
 
 Warnings. You have the right to remain silent. Anything you say may be used against you in court. If you-you have the right to call an attorney (indiscernible) have him present any time during questioning. If you decide — if you cannot afford an attorney one will be appointed to you without cost. If you decide to answer any questions (indiscernible) stop answering questions. Do you understand your rights?
 

 Alvarez answered “yes, sir.”
 

 After the Faulkner interview Brock again spoke to Alvarez, beginning in the late afternoon. This final interview last 3 hours, 11 minutes. Brock did not reread Alvarez his
 
 Miranda
 
 rights or ask again that he waive them. Alvarez confessed at the end of this third interview.
 

 Alvarez moved to suppress his confession. At the hearing on the motion, defense counsel expressly limited his argument to two points, indicating he was waiving all other grounds. First, he claimed that the
 
 Miranda
 
 warning was legally insufficient because it did not tell Alvarez he had the “right to have counsel appointed for him prior to his interrogation.” Second, he claimed that Alvarez unambiguously invoked his right to remain silent after initially waiving his rights and questioning should have stopped. The trial court denied the motion after an eviden-tiary hearing.
 

 A trial Court’s ruling on a motion to suppress is presumed correct.
 
 See Connor v. State,
 
 803 So.2d 598, 605 (Fla.2001);
 
 Murray v. State,
 
 692 So.2d 157, 159 (Fla.1997). Factual findings are disturbed only if clearly erroneous because not supported by substantial, competent evidence.
 
 See Herrera-Fernandez v. State,
 
 984 So.2d 644, 646 (Fla. 4th DCA 2008). The application of the law to those facts, though, is reviewed anew.
 
 See Owen v. State,
 
 862 So.2d 687, 695 (Fla.2003);
 
 Connor,
 
 803 So.2d at 605-08;
 
 Alvarez v. State,
 
 890 So.2d 389, 392 (Fla. 1st DCA 2004). Specifically, the adequacy of a
 
 Miranda
 
 warning, once any factual disputes are resolved, is a question of law subject to review without a presumption of correctness.
 
 See Roberts v. State,
 
 874 So.2d 1225, 1227 (Fla. 4th DCA 2004). Courts “need not examine
 
 Miranda
 
 warnings as if construing a will or defining the terms of an easement.”
 
 Duckworth v. Eagan,
 
 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). The warning, though, must convey that (1) the individual has the right to remain silent; (2) anything he says can be used against him in court; (3) he has the right
 
 *742
 
 to the presence of an attorney; and (4) if he cannot afford an attorney, one will be appointed for him prior to questioning, if he wishes.
 
 Miranda,
 
 384 U.S. at 467-473, 479, 86 S.Ct. 1602.
 

 The Florida Self-Incrimination Clause, article I, section 9 of the Florida Constitution, provides that “[n]o person shall be ... compelled in any criminal matter to be a witness against oneself.” Under Florida law, then, prior to custodial questioning a suspect must be told (1) he has the right to remain silent; (2) that anything he says may be used against him in court; (3) that he has a right to a lawyer’s help, which means the right to consult a lawyer before being questioned and to have a lawyer present during questioning; and (4) if he cannot afford a lawyer one will be appointed for him.
 
 See Traylor v. State,
 
 596 So.2d 957, 965-66 (Fla.1992). These rights must be given so that a person of average, ordinary intelligence can understand them.
 
 See State v. Powell,
 
 998 So.2d 531, 540 (Fla.2008).
 
 [2]
 

 Here, the warning, given both orally and in writing, adequately informed Alvarez that he had the right to a court-appointed attorney at all times, both prior to and during questioning. Specifically he was told he had the right to an attorney “at this time,” which was before the questioning started. Police officers need not give a talismanic incantation of a suspect’s constitutional rights, provided the statement given is a fully effective equivalent.
 
 See California v. Prysock,
 
 453 U.S. 355, 359-360, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). The warning sufficiently told Alvarez he had the right to counsel both prior to questioning “and to have one present now or at any time during the questioning.” (Emphasis added).
 
 See also Chavez v. State,
 
 832 So.2d 730, 750 (Fla.2002);
 
 Johnson v. State,
 
 750 So.2d 22, 25 (Fla.1999).
 

 Alvarez’s reliance on
 
 Thompson v. State,
 
 595 So.2d 16 (Fla.1992) is misplaced. There, the defendant was not told he was entitled to court-appointed counsel if he could not afford to hire one himself.
 
 Id.
 
 at 17-18.
 

 B. Revocation of Waiver of Right to Remain Silent
 

 In the second attack on his confession’s admissibility, Alvarez claims that he unambiguously invoked his right to remain silent midway through his second interrogation; that questioning should have ceased; and that his later confession should have been suppressed.
 

 Alvarez was given his
 
 Miranda
 
 rights, both orally and in writing, before his first interview. During this initial 54 minute interview he repeatedly denied knowing anything about the crimes. He was given
 
 Miranda
 
 rights, again both orally and in writing, before Faulkner began the voice stress test. About two thirds through that second interview he asked to use the bathroom. Faulkner responded, “yeah, give me one second, okay? You are sure you don’t want to talk to me?” Alvarez responded “I really don’t have nothing to say.”
 

 
 *743
 
 Alvarez had steadfastly maintained he knew nothing about the crimes during his initial interview with Brock and before his alleged revocation of his silence waiver to Faulkner. Immediately preceding the allegedly unambiguous revocation he was asked “[d]o you want to sit here and talk with me and let’s talk about this?,” to which he responded “I just don’t know what to say.” He was asked “[c]an you answer some questions for me?,” to which he replied “I can try.” He was asked where he had gotten the gun and responded he did not have a gun. He was asked who got the gun and responded he did not know. He was asked why he did not want to help himself and responded “[y]ou know, it’s cause I have nothing to offer ...” He was asked how well he knew Elizabeth and responded he did not know her. He was asked who burned up the car and said he did not know. He was asked how the crime occurred and responded “I don’t know, that’s what I’m saying.... I don’t know what caused it, that’s what I’m saying. I don’t know what really happened or what.” He was asked who was involved and he said he did not know: “I just don’t know what happened or caused it, why it happened and how it happened.” Immediately after that answer, he asked to use the bathroom and the disputed colloquy occurred.
 

 Faulkner testified at the motion to suppress hearing that he did not interpret Alvarez’s statement as an invocation of his right to remain silent. He testified he did not coerce Alvarez to speak; that Alvarez never clearly indicated he no longer wanted to speak with him; and that he never felt that Alvarez did not want to speak with him. When Alvarez returned from the bathroom he completed his interview with Faulkner without incident.
 

 If a suspect unambiguously or unequivocally invokes his right to remain silent during a custodial interrogation further questioning must scrupulously honor that right.
 
 See Miranda,
 
 384 U.S. at 473, 86 S.Ct. 1602;
 
 Edwards v. Arizona,
 
 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). If a
 
 post-Miranda
 
 waiver of the right to remain silent is ambiguous or equivocal, though, clarification is not required and further questioning is permitted.
 
 See Davis v. United States,
 
 512 U.S. 452, 458-461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)
 
 (Miranda’s
 
 ease of application would be lost “if we were to require questioning to cease if a suspect makes a statement that
 
 might
 
 be a request for an attorney .... We therefore hold that, after a knowing and voluntary waiver of the
 
 Miranda
 
 rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.”);
 
 State v. Owen,
 
 696 So.2d 715, 717-718 (Fla.1997)
 
 (Davis
 
 applies in equivocal assertion of any
 
 Miranda
 
 right);
 
 see generally, United States v. Rodriguez,
 
 518 F.3d 1072 (9th Cir.2008).
 

 The trial court found that Alvarez’s statement was, at most, equivocal or ambiguous. There is no factual dispute about the words used. The parties dispute their meaning in context. The issue, then, is whether the factual finding that the statement was ambiguous in context was supported by competent, substantial evidence.
 

 A revocation of a waiver of the right to remain silent is unambiguous
 
 [3]
 
 if a reasonable police officer under the circumstances would understand that the suspect is invoking the right.
 
 See Alvarez,
 
 890 So.2d at 394. Thus the statement is considered in context.
 

 
 *744
 
 In
 
 Owen,
 
 696 So.2d at 719-20 the Florida Supreme Court found these statements to be equivocal: “I don’t want to talk about it” and “I’d rather not talk about it.” These statements were made in response to questions about whether the crime was random or planned and where the suspect put his bicycle during the crime.
 
 See id.
 
 at 717 n. 4.
 

 In
 
 State v. Pitts,
 
 936 So.2d 1111, 1130-31 (Fla. 2d DCA 2006), the court found that a suspect’s response of “[n]o sir,” after being asked if he was willing to speak to the interrogating officer on tape, to be ambiguous where he had just agreed to speak on tape, since a reasonable officer under the circumstances would have thought either the suspect had misunderstood the question or the officer had misunderstood the answer.
 

 In
 
 Alvarez v. State,
 
 890 So.2d at 393, 395, the statement “[f]rom here on, I’m not supposed to talk about it. Mr. Stanfield told me not to talk about the rest of this,” when the subject turned to what had happened after the victim took the suspect home to his apartment, was found not to have “sufficient clarity that a reasonable police officer in the circumstances would have understood Alvarez’s statements to be an assertion of a constitutional right.”
 

 In
 
 State v. Davis,
 
 971 So.2d 1017, 1018 (Fla. 1st DCA 2008), a suspect was asked which of three officers he would feel more comfortable talking to. He responded “none of them.”
 
 Id.
 
 The statement was found to be an ambiguous invocation since it was unclear whether the suspect meant that he did not want to speak to anyone or just not to one of the three officers.
 
 Id.
 
 at 1019;
 
 see also State v. Moya,
 
 684 So.2d 279, 280-81 (Fla. 5th DCA 1996) (“I don’t know” in response to question about whether suspect wanted to talk was equivocal);
 
 Ford v. State,
 
 801 So.2d 318, 319-20 (Fla. 1st DCA 2001) (“Just take me to jail” was an ambiguous attempt at invocation).
 

 In contrast, courts have been more apt to find a revocation of a waiver of the right to remain silent unambiguous and unequivocal if made
 
 before
 
 substantive questioning. Thus, in
 
 United States v. Reid,
 
 211 F.Supp.2d 366, 368 (D.Mass.2002), cited by the defense, the defendant was taken into custody following a transatlantic flight at 12:55 p.m. He was first given his
 
 Miranda
 
 warning at 1:00 p.m., before being transported to the state police barracks for temporary detention.
 
 Id.
 
 at 368-69. The transporting officer asked Reid some questions, most of them mundane.
 
 Id.
 
 at 369. He then asked Reid what happened on the plane, to which Reid responded “nothing.”
 
 Id.
 
 Reid asked the officer whether reporters were covering his detention, became indignant when told there were no media, and retorted “I have nothing else to say.”
 
 Id.
 
 He was at the police barracks by 1:30 p.m.
 
 Id.
 
 The district court found Reid’s invocation of his right to remain silent unambiguous.
 
 Id.
 
 at 371. In so holding it noted both that the types of questions answered prior to an invocation may provide a context for finding an alleged invocation ambiguous, though holding that the officer and Reid’s “banter” before Reid’s statement was not the type of dialogue that could trigger such a finding, and that the parties’ reactions shortly after the alleged invocation may shed light on whether the suspect intended to invoke his right.
 
 Id.
 
 at 372-74.
 
 [4]
 

 The defense cites several cases addressing motions to suppress where a defendant claims an ambiguity in his initial waiver.
 
 *745
 

 See, e.g., Cuervo v. State,
 
 967 So.2d 155, 157, 162-63 (Fla.2007) (“I don’t want to declare anything” in response to an initial request to waive a suspect’s constitutional rights was unambiguous);
 
 Smith v. State,
 
 915 So.2d 692, 693-94, 694 n. 1 (Fla. 3d DCA 2005) (suspect’s statement in no uncertain terms that he had “nothing to say” to law enforcement when asked if he wanted to waive his rights and give his side of the story was unambiguous);
 
 Arnold v. Runnels,
 
 421 F.3d 859, 862 (9th Cir.2005) (defendant permissively selectively invoked his
 
 Miranda
 
 right to refuse to speak on tape; law enforcement turned on a tape recorder and posed the defendant a series of questions, to which he responded “no comment;” the tape was played for the jury).
 

 Invocation and waiver of constitutional rights are distinct inquiries, though, and should not be merged.
 
 See Smith v. Illinois,
 
 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). The state must prove by a preponderance of the evidence that a suspect has voluntarily, knowingly, and intelligently waived his
 
 Miranda
 
 rights before a statement may be used against him.
 
 See Colorado v. Connelly,
 
 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986);
 
 Ramirez v. State,
 
 739 So.2d 568, 575 (Fla.1999). Thus, an ambiguous waiver must be clarified before initial questioning.
 
 See Rodriguez,
 
 518 F.3d at 1080. However, once a suspect has waived his rights, an attempt to revoke the waiver must be unambiguous.
 
 See Owen,
 
 696 So.2d at 717-718;
 
 Collins v. State,
 
 4 So.3d 1249, 1250 (Fla. 4th DCA 2009). Unlike the pre-waiver context, an ambiguity need not be clarified before proceeding with questioning.
 
 See Davis,
 
 512 U.S. at 459, 114 S.Ct. 2350;
 
 Owen,
 
 696 So.2d at 717;
 
 Collins,
 
 4 So.3d at 1250. This rale regulates the tension recognized in
 
 Miranda
 
 between, on the one hand, the preservation of the right against self-incrimination and, on the other, the need for clear rules for law enforcement in the field.
 
 See Davis,
 
 512 U.S. at 461, 114 S.Ct. 2350.
 

 These rulings make sense: if a suspect has not answered any questions and fails to clearly waive his right to remain silent, or has waived his right but then answered only “mundane” questions before any substantive questioning, announcing he does not want to answer anymore, it is reasonable to conclude that he has decided not to speak. However, where a suspect has heard, understood, and waived his
 
 Miranda
 
 rights, and has been answering substantive questions without incident and continues to do so, a statement which may have been unambiguous if uttered initially may be objectively ambiguous when considered in context. The question immediately preceding Alvarez’s statement that he had nothing to say was simply whether he could wait a minute and talk some more before using the bathroom. That is not the type of question a reasonable officer would conclude would trigger a spontaneous, global invocation of the right to remain silent.
 

 Instead, the words Alvarez now claims represent that global invocation are consistent with his answers to the series of questions immediately preceding the exchange: he had nothing to say because he knew nothing about the crimes, not because he was refusing to talk. Both Alvarez’s and Faulkner’s actions after the alleged invocation are consistent with the trial court’s finding that Alvarez’s statement was, at best, ambiguous, and not intended to invoke his constitutional right to remain silent. Although the same words in a different context could mean he knew the answer but was refusing to respond to either that or any other question, such an interpretation is not the only one consistent with the exchange. Conse
 
 *746
 
 quently, Alvarez’s response was not an unambiguous invocation of his right to remain silent and Faulkner was not required to end the interrogation or clarify Alvarez’s intent.
 
 See Owen,
 
 696 So.2d at 717;
 
 Davis,
 
 512 U.S. at 459, 114 S.Ct. 2350.
 

 Alvarez’s statement of constitutional rights comported with both state and federal law. He does not challenge his waiver of those rights. He never unambiguously revoked his waiver of those rights. The trial court properly denied his motion to suppress.
 

 II. Principals Instruction
 

 The court held a charge conference prior to closing argument. All the instructions were agreed to but one. The state requested the standard instruction on principals, Florida Standard Jury Instruction (Criminal) 3.5(a), arguing that the jury could conclude that Alvarez had help in committing the crimes. The defense objected, arguing that the instruction was not supported by the evidence. The court instructed the jury:
 

 If the defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all of the things that the other person or persons did if:
 

 1. The defendant had a conscious intent that the criminal act be done, and
 

 2. The defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit or attempt to commit the crime
 

 To be a principal the defendant does not have to be present when the crime was committed or attempted.
 

 The instruction was supported by the evidence. First, near the end of the third custodial interview, Alvarez asked for a pen and paper. He originally wrote “I took them to the dead end street shot curtís then elizabeth.” He later crossed out “took” and “to” and substituted “meet” and “at,” so that it read “I meet them at the dead end street shot curtís then eliza-beth.”
 

 Second, at trial the state presented the testimony of Steven Castillo, James Ten-ney, Jose Santibanez, Evie Serrano, Jose Aranda, David Compton, Teresa Landa-verde, several experts, and several law enforcement officers, among others, and played Alvarez’s taped confession, all of which supported the instruction.
 

 Castillo testified to a confrontation between Curtis, Alvarez’s younger brother Junior, and Samuel Madronna two to four weeks before the murders.
 

 Compton testified that Alvarez talked to him about a week before the murders and asked for a gun. He said that Alvarez came to his house with three other people, including Junior, to borrow the gun, though the others stayed in the car. Compton testified that he gave Alvarez a snub-nosed .38 and a box of cartridges which Compton kept under the seat of a car in his front yard. Compton testified Jose Aranda was with him when Alvarez came to get the gun.
 

 Curtis’s father, James Tenney, testified that he last saw Curtis at 8:45 the night of the murders. Mr. Tenney testified that he found out about Curtis and Elizabeth’s murders the next morning, about 5:30 or 6 a.m., from law enforcement. Brock told the jury that Alvarez told him that he was at his uncle’s house when he heard from Jose Aranda about midnight the night of the murders that Curtis had been shot. According to Brock, Alvarez told him that Aranda told Alvarez that he had heard about the shooting from someone named Paco.
 

 
 *747
 
 Jose Santibanez lived near the murder scene. He testified he was home watching television the night of January 8 when he heard what sounded like a car door closing, followed by a car horn blowing steadily. When he looked outside he saw a fire across the road, through the woods. He drove as close as he could, saw a car on fire, and called 911. A few minutes later a deputy arrived, who called for additional help.
 

 The jury heard testimony that after the fire was put out law enforcement discovered Curtis and Elizabeth’s badly burned bodies in the front driver and passenger seats. Each had a single gunshot wound to the head. The scene was searched, but no shell casings were recovered. The bullets that lulled both victims were recovered. The gun retrieved from Compton was searched for fingerprints. A part of one “poor quality” latent print was found that revealed a whirl pattern, consistent .with Aranda and Alvarez’s prints, but not Compton or the gun owner’s. Junior’s prints were not compared. The gun was test fired and the spent cartridges compared to those recovered at the scene. The class markings were consistent, meaning that the recovered cartridges could have been fired from Compton’s gun. There were insufficient individual markers, though, to confirm that they actually were. Thus, while both the finger print and recovered cartridges did not exclude the possibility that Alvarez used the gun to kill Curtis and Elizabeth, they did not prove that he did. There was expert testimony that the victims could have been killed by bullets fired from two different guns.
 

 There was expert testimony that gasoline was used as an accelerant near the front center of the car’s passenger compartment, and that the fire could not have been started by firing a gun. In the portion of his confession played to the jury, Alvarez denied starting the fire or having gasoline.
 

 Castillo testified that about 2 to 3 weeks after the murders he was driving around with Alvarez and Serrano when Alvarez said the he had shot both Curtis and Eliza-beth in the back of the head and that the car had blown up. Castillo said that Alvarez told him he shot them because Curtis had a gun and wanted to kill Junior. Serrano testified that he, Castillo, and Alvarez were driving around in Castillo’s ear, drinking and smoking, when the subject of the murders came up and Alvarez said he did it. Serrano denied that Alvarez said that Junior was having a problem with Curtis.
 

 In closing, the state acknowledged that there were credibility problems with some of its witnesses. Aranda’s testimony was “a real teeth pulling episode ... He had no memory, couldn’t recall.” The prosecutor noted that the jurors would make their own conclusions about the evidence, and what inconsistencies in the evidence mean.
 

 You may say to yourself, boy, there’s a lot of other people involved in this, we keep hearing these names, ... Samuel Madronna, Junior ....Now what was their involvement? What did they do? Who would you lie to protect? To the extent that the Defendant is lying in his final confession, who most will you lie to protect? ... [sjome of us said you might lie to protect somebody you love, like a family member, like maybe Junior. But what does that mean? See, he wouldn’t admit to that arson. He never did confess to the arson. He probably didn’t strike the match that lit the car on fire. He wasn’t going to admit to something he didn’t do, but he wasn’t going to give up whoever did do that. WThat I’m saying is, it should be clear to everybody he had help. He got the gun. He set up the meeting. He murdered the victims,
 
 *748
 
 but he probably had help because look what his note says. His note says, ‘I meet them at.’ All right, but crossed out underneath there is, T took them to the dead end street’ where they were waiting for them. He got them there and more likely then (sic) not, helped. And so you say to yourself, who, what does that mean... ? It means nothing .... [A]s long as people who know what happened, breathe and live and can come forward, they too some day may be subject to prosecution. That doesn’t mean Mark Alvarez gets to walk. That’s not the way it works. Today, here, he will be accountable under the law for his actions.
 

 During defense counsel’s closing statement he argued that Compton’s refusal to talk absent a grant of immunity showed he was complicit. He noted that Serrano did not go to law enforcement when Alvarez confessed, and that Seiran» and Castillo’s versions of the same confession differed, implying they may have been involved. He argued that Aranda’s testimony was not truthful and had to be coaxed out of him because “he knows more then [sic] he is saying or he is somehow complicit in the homicide.”
 

 Defense counsel then turned to the principals instruction, saying “[w]hy are you given this instruction? Interesting. Apparently, everybody agrees more then (sic) one person was present when these homicides occurred. If not for that, you would never been given that instruction.”
 

 Later, defense counsel argued “[s]o what’s the reasonable doubt? Junior did it. Mark is taking the fall for his younger brother.... Is it so unbelievable to believe that he might take the fall for his younger brother? It happens and it’s what happened in this case and it’s what’s happening in this case.... [Mark] caves in, covers for his brother, says, okay, I did it. He certainly isn’t going to say Junior did it.”
 

 Alvarez claims that the trial court erroneously gave the standard principals instruction and that the state improperly used that instruction to argue the confusion in the record was not inconsistent with its theory of the case.
 

 There was evidence before the jury that Curtis had fought with others, including Alvarez’s brother Junior, before his murder; that Alvarez procured the murder weapon from Compton accompanied by three other people and in the presence of a fourth; that Alvarez did not have gasoline, though gasoline was used as an accelerant in the arson; that Alvarez’s original written confession implied that he had taken Curtis and Elizabeth to an isolated area where someone was waiting; that the forensic evidence did not exclude others’ involvement; and that two other people knew about the murders before they were public. Given this evidence, a reasonable juror could have concluded that Alvarez acted in concert with others in committing the crimes.
 
 See generally Masaka v. State,
 
 4 So.3d 1274 (Fla. 2d DCA 2009). Consequently, the trial court did not abuse its discretion in giving the principals instruction.
 
 See Lewis v. State,
 
 693 So.2d 1055, 1058 (Fla. 4th DCA 1997). The state did not make an impermissible argument from the evidence.
 

 Conclusion
 

 We find that Alvarez’s constitutional warning adequately conveyed his right to confer with counsel prior to questioning and that he did not unambiguously invoke his right to remain silent after waiver. Thus the motion to suppress was properly denied. Further, the tria1 court did not abuse its discretion in giving the principals instruction and the state did not use the instruction to make an improper argu
 
 *749
 
 ment. We find no error appearing in the record before us, and affirm.
 

 GROSS, C.J., and FARMER, J., concur.
 

 [1]
 

 .
 
 Miranda v. Arizona, 384
 
 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [2]
 

 . Alvarez's contention that his confession should have been suppressed because he was not specifically told he had the right to speak with counsel before being questioned is based on state, not federal, law.
 
 See Powell,
 
 998 So.2d at 537-38;
 
 cf. United States v. Prankson,
 
 83 F.3d 79, 82 (4th Cir.1996) (statement that suspect had right to an attorney without specifically stating that right applied both pri- or to and during questioning adequately conveyed right to consult with attorney prior to questioning). In referring to a
 
 Miranda
 
 warning in this opinion, then, we are adopting the parties' colloquial, not technical, use of the phrase.
 

 [3]
 

 . Alvarez argues his statement was ambiguous, not equivocal.
 
 See Rodriguez,
 
 518 F.3d at 1077 (equivocal evinces uncertainty; ambiguity allows more than one interpretation).
 

 [4]
 

 . The state also cites to
 
 Dubon v. State,
 
 982 So.2d 746 (Fla. 1st DCA 2008). That case does not give any context to the defendant's three custodial statements that he has “nothing to say.”
 
 Id.
 
 at 746-47.