PER CURIAM.
The Appellant, Kelvin Orlando Miles, appeals his convictions for sexual battery with a deadly weapon and kidnapping with a deadly weapon and the corresponding consecutive life sentences. Miles raises three arguments on appeal, asserting that the trial court erred by (1) denying his motion in limine to exclude DNA evidence and testimony concerning the DNA evidence; (2) denying his oral motion to suppress statements he made during a police interview after he invoked his right to remain silent; and (8) by imposing a sentence which deviated from the recommended or permitted score sheet sentence. We find no error in the trial court’s denial of the motion in limine to exclude the evidence regarding the DNA or the trial court’s imposition of the sentence. However, we conclude that the trial court erred by denying Miles’ motion to suppress the statements he made to police after he invoked his right to remain silent. Despite compelling evidence of Miles’ guilt in this case, we are unable to conclude beyond a reasonable doubt that the error did not contribute to Miles’ conviction. We must, therefore, reverse and remand for a new trial.

Facts and Procedural Background

During the early morning hours of January 13, 1990, the victim in this case was exiting the vehicle she was driving when she was kidnapped and sexually battered by an assailant. The victim was unable to identify the assailant. When police officers found the victim in the vehicle a few hours later, they transported her to Ala-chua General Hospital where a sexual assault examination was conducted. Four sexual assault swabs were collected from the victim, placed in a sealed kit, and turned over to the Gainesville Police Department.
*450 The Gainesville Police Department sent the sealed kit to the Florida Department of Law Enforcement (FDLE) in late 1993. Due to a backlog of cases requiring DNA analysis, the kit was not tested until 2003. The 2003 testing yielded a DNA profile that was matched to Miles in 2008, after the DNA profile was entered into FDLE’s Combined DNA Index System database.
After obtaining the hit in the database, in April 2008 two detectives from the Gainesville Police Department met with Miles in prison where he was incarcerated for other crimes to interview him about the 1990 crimes. The detectives began the interview as follows: “We have to discuss why we’re here, why we know you’re associated with this case. I just want to ask you, would you be willing to talk to us about this case?” Miles responded by stating, “[actually, I don’t know nothing about this, so I’m not fixing to say nothing about this.” The detectives then told Miles that “it was not a question of whether ... [he] did it.” They informed Miles that they had his DNA and that was as good as a signed confession. The detectives continued the interview, making a few more statements, then advising Miles of his Miranda rights.
At no point during the interview was Miles provided any details of the sexual battery other than that it occurred in Gainesville in 1990. During the interview, Miles made the following statements: “It wasn’t like I raped this girl or nothing like that. It ain’t like what she’s saying.... What can I possibly tell you? We had sex. Just — that’s that.”
During the interview, the detectives also obtained a cheek swab from Miles. The analyst from the lab who performed the DNA analysis on the cheek swab and compared it to the unknown DNA profile developed by the lab in 2003 testified at trial that there was a one in 900 quadrillion likelihood that an unrelated person’s DNA would contain the same profile.
At a pre-trial hearing, Miles moved to suppress the statements he made during the interview asserting that he had invoked his right to remain silent, but made potentially incriminating statements after the detectives continued to question him. After hearing argument from the parties and listening to an audiotape of the interview, the court denied Miles’ motion, stating that it did not hear “Miles make an unequivocal invocation of his right to remain silent.”
The audiotape of the police interview was played for the jury. The detectives who conducted the interview testified at trial regarding the interview. During opening and closing statements, the prosecution referred to the statements made by Miles during the interview. Just before the jury retired for deliberations, two members of the jury inquired of the trial judge whether the audiotape or a transcript of the audiotape of the 2008 police interview would be available to the jury during deliberations. The court responded that the jury could listen to the audiotape in the courtroom, but that no transcript would be available. The record does not reflect that the jury listened to the audiotape for a second time. The jury returned a verdict finding Miles guilty of sexual battery with a deadly weapon and kidnapping with a deadly weapon. Miles was sentenced to life sentences on both counts, to be served consecutively.

Analysis

Standard of Review

In reviewing a trial court’s ruling on a motion to suppress, the appellate court must determine (1) whether competent, substantial evidence supports the trial court’s findings of historical fact; and (2) whether the trial court reached the correct *451 legal conclusion. Thomas v. State, 894 So.2d 126, 136 (Fla.2004). Because the facts in this case are undisputed and the issue is purely one of law, we review the trial court’s ruling under the de novo standard.

Invocation of the Right to Remain Silent

Under both the United States and Florida Constitutions, a person may not be “compelled” to be a witness against himself or herself in any criminal matter. U.S. Const, amend. V; art. I, § 9, Fla. Const. To safeguard the privilege against self-incrimination, a person questioned while in custody must be clearly informed as to his or her rights, including the “right to remain silent” and that “any statement he does make may be used as evidence against him.” Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A defendant may waive these rights, but the waiver must be made voluntarily, knowingly, and intelligently. Id.
Further, police must not begin interrogation, or if it has already begun, must immediately cease “if the suspect indicates in any manner that he or she does not want to be interrogated.” Cuervo v. State, 967 So.2d 155, 161 (Fla.2007) (quoting Traylor v. State, 596 So.2d 957, 966 (Fla.1992)). Although no magic words are required to invoke the right to remain silent, a suspect must communicate his desire to remain silent and to end questioning “with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.” State v. Owen, 696 So.2d 715, 718 (Fla. 1997). Once a suspect has invoked his right to remain silent, “the police must refrain from ‘any words or actions ... (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.’ ” State v. Hunt, 14 So.3d 1035,1038 (Fla. 2d DCA 2009) (quoting Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). Statements obtained after a suspect has invoked his right to remain silent may only be admitted when “the suspect’s right was ‘scrupulously honored.’ ” Id. (quoting Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)).
On the other hand, where a defendant makes only an equivocal or ambiguous request to terminate an interrogation, police are not required to ask questions to clarify the suspect’s intent, but may instead continue with the interrogation. Owen, 696 So.2d at 719. In Owen, the supreme court held that the responses of “I don’t want to talk about it” and “I’d rather not talk about it” to factual questions concerning insignificant details of crime and not whether the defendant wished to speak about the crime were equivocal requests to invoke the right to silence. Id. at 717, 719-20. However, the Florida Supreme Court has since made clear that the holding in Owen regarding equivocal requests “applies only where the suspect has waived the right earlier during the session.” Almeida v. State, 737 So.2d 520, 523 n. 7 (Fla.1999); accord Cuervo v. State, 967 So.2d 155, 162 (Fla.2007). Accordingly, if the suspect makes an equivocal request to remain silent before waiving his Miranda rights, the police must clarify the suspect’s intent before continuing the interrogation. See Alvarez v. State, 15 So.3d 738, 745 (Fla. 4th DCA 2009).
Here, at the very outset of the interview of Miles by detectives and before he was advised of his Miranda rights, Miles made a statement indicating his reluctance to talk to the police. The detectives who conducted the interview testified at trial that before beginning the interview *452 they told Miles that they were there to talk to him about a rape or sexual battery that occurred in 1990. The audiotape of the interview begins with the detectives inquiring whether Miles would be willing to talk to them about the case: “We have to discuss why we’re here, why we know you’re associated with this case. I just want to ask you, would you be willing to talk to us about this case?” Miles responded to the inquiry with the following statement: “Actually I don’t know nothing about this, so I’m not fixing to say nothing about this.”
The trial court determined that this statement by Miles was not an unequivocal invocation of his right to remain silent, and therefore, denied Miles’ motion to suppress statements he made later in the interview. This was error. Under binding precedent from the Supreme Court, we are unable to conclude that the statement was equivocal. See Cuervo v. State, 967 So.2d 155, 163 (Fla.2007). In Cuervo, the Florida Supreme Court held that Cuervo’s statement “I don’t want to declare anything” was a “clear invocation of the right to remain silent.” Miles’ statement to the detectives in this case is indistinguishable from the statement at issue in Cuervo. Because Miles’ statement indicating that he did not want to discuss the case was unequivocal, the detectives were required to terminate the interrogation. Id. at 163— 65. Even if the statement could be construed as an equivocal request to remain silent, because Miles had not yet waived his Miranda rights, the detectives were required to clarify his intent before proceeding further with the interrogation. See Almeida, 737 So.2d at 523 n. 7. They did not do so.
Based on the facts of this case and the binding authority of Cuervo and Owen and its progeny, we are compelled to hold that the trial court erred by denying Miles’ motion to suppress statements he made to police after he invoked his right to remain silent. See Dubon v. State, 982 So.2d 746, 746-47 (Fla. 1st DCA 2008).

Hannless Error Analysis

The trial court’s ruling is subject to harmless error analysis. The harmless error test places the “burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.” State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). When applying the harmless error test, appellate courts are required not only to examine the permissible evidence on which the jury relied, but to even more closely examine “the impermissible evidence which might have possibly influenced the jury verdict.” Id.
Although the State presented compelling DNA evidence linking Miles to the crimes in this case and suggesting his guilt, the State produced no additional forensic evidence connecting Miles to the crimes. The sexual battery and kidnapping took place in a car, with no witnesses other than the victim present. The victim could not identify her assailant and when she testified at trial, the victim was unable to identify Miles as the assailant.
The detectives who conducted the 2008 interview of Miles were examined at length during the trial regarding their questions to Miles and his responses to the questions, as well as Miles’ demeanor during the interview. An audiotape of the interview was played for the jury. Although the detectives testified that Miles was not provided any details of the sexual battery and kidnapping other than that it occurred in Gainesville in 1990, the jury heard the following statements by Miles in response to questioning by detectives through the *453 admission of the audiotape: “It wasn’t like I raped this girl or nothing like that. It ain’t like what she’s saying.... What can I possibly tell you? We had sex. Just— that’s that.” During opening and closing statements, the prosecution referred to the statements Miles made during the interview. Finally, immediately before the jury retired for deliberations, two members of the jury asked the trial court whether the audiotape or a transcript of the audiotape were available to the jury to review during its deliberations.
Although the evidence of Miles’ guilt is compelling, the standard we must apply in reviewing the error here is not a “sufficiency-of-the-evidence” or “an overwhelming evidence” test. DiGuilio, 491 So.2d at 1139. Instead, this court is required under the controlling precedent of DiGuilio to examine whether the improperly admitted statements and testimony concerning those statements contributed to the jury’s verdict. Id. Under the facts of this case, we are unable to conclude to the exclusion of all reasonable doubt that the erroneously admitted statements did not contribute to the jury’s verdict. Id. Accordingly, we reverse Miles’ conviction and sentence and remand for a new trial.
WEBSTER and ROWE, JJ., concur.
MARSTILLER, J., Concurs in Part, Dissents in Part.